## CHARLOTTE, COLUMBIA & AUGUSTA R. R. COMPANY v. GIBBES, TREASURER.

1. Under the 41st section of the Act of 1841 (11 *Stat.*, 168, now section 1361 of the General Statutes), every charter thereafter granted, amended, or renewed, was subject to amendment, alteration, or repeal, unless specially excepted from this provision by the act of incorporation or amendment; and under the constitution of 1868 (art. XII., § 1), "corporations may be formed under general laws, but all such laws may from time to time be altered or repealed."  Prior to 1868 two railroad corporations were chartered, both of which were excepted from the operation of the 41st section of the Act of 1841, but by an act passed in 1869, containing no such exception, these two corporations were consolidated into one.  *Held*, that the charter of this consolidated company was subject to amendment by the legislature.
2. Where a railroad company holds its charter subject to legislative amendment, an act requiring such company to pay into the State treasury an assessment of money towards defraying the expenses of a com-

mission appointed by the State to supervise railroads, is, in effect, an amendment of such charter, and therefore is legal, valid, and binding on the company.

3. Has a corporation the rights guaranteed by the constitution to natural persons?

4. The assessment upon a railroad company to pay the expenses of a railroad commission, based upon the gross income of the company, is not a tax upon property, but is in the nature of a license tax upon the business of railroad companies.

MR. JUSTICE McGOWAN concurred in the result, and MR. JUSTICE McIVER dissented.

Before FRASER, J., Richland, April, 1886.

The appeal came to this court from the following Circuit decree :

This case was heard by me at the term of the court held in March and April, 1886. As the case will be the subject of consideration in another court for the purpose of settling important questions involved, I will confine myself to a brief statement of the facts and the reasons for the conclusions reached by me.

The plaintiff, a corporation under the laws of this State, was charged on the books of the county treasurer, for the fiscal year 1883, with the sum of nine hundred and eighty-seven 75–100 dollars, as plaintiff's proportion, according to gross income, of the salary and expenses of the railroad commissioners. This amount is by law collectible in the same manner as taxes, and has been paid under protest. This action has been brought to have this assessment declared illegal, and thereby to enable plaintiff to recover back the amount so paid.

In the case of *The Columbia & Greenville Railroad Company* v. *Wade Hampton Gibbes, as Treasurer of Richland County,* 24 *S. C.,* 60, the Supreme Court held that the assessment was valid. The general provisions of the railroad commissioners' act were enacted in 1879, and, therefore, were in force when the corporation in that case was organized under the general law then in force. It was held by the Supreme Court that the assessment was legal and valid, because the law under which the assessment was made was in force when the corporation was formed, and, therefore, one of the conditions of its existence. This conclu-

sion of the Supreme Court must have been reached on the assumption that this was one of the conditions which the legislature had a right to impose on new corporations, either under the power to levy taxes, or some other power which the constitution gives to the legislature.

In the case now before the court, the corporation was in existence when the general provisions of the railroad commissioners' act became law in 1879.   By the act of March, 1869, the Charlotte & South Carolina Railroad Company and the Columbia & Augusta Railroad Company were consolidated, and with some slight modifications all the rights, powers, and privileges of these two companies were conferred on the plaintiff corporation under its present name.   This consolidation act worked a dissolution of the old corporations and created one entirely new, and deriving all its powers, rights, and privileges from the consolidation act. This act contained no provision excepting this corporation from the act of 1841, now section 1361 of the General Statutes. The charter, therefore, became subject to "amendment, alteration, or repeal by the legislature, at its will."   *Shields* v. *Ohio*, 95 *U. S.*, 319 ; 15 *Wall.*, 454.

It is claimed that this assessment is an unconstitutional tax, and cannot be imposed on an existing corporation under this power to amend, alter, or repeal.   I take it to be law that the legislature has no power in granting a charter to a corporation to exempt its property from the liability to equal assessment and taxation ordained by the constitution of 1868.   The property of every corporation, as that of natural persons, is bound for its equal share of the taxes, and no more can be imposed.

Article IX., sec. 1, Constitution of 1868, requires "a uniform and equal rate of taxation," and art. XII., sec. 2, makes corporations "now existing or hereafter created," "subject to taxation." If the property of corporations is under the control of the constitution, and cannot be exempted from taxation, it seems to follow that the constitution protects it from any greater taxation than is imposed on other property.   If the constitution controls for one purpose, it does for the other.   Corporations "hereafter created" cannot be subjected to any greater taxation than those "then existing," all of which are liable only to the equal taxation.

If this· be the correct view, then there could have been in the mind of the Supreme Court nothing in this assessment in itself obnoxious to these constitutional provisions, or the mere fact that the assessment was in pursuance of an act passed before the corporation was created could not have made it valid as one of the conditions of the charter.   In other words, the legislature has no right to exempt any corporation then existing, or at the time of its formation, or afterwards to be created, from its liability to taxes, or to impose on them more than an equal share.   If the fact that the validity of this assessment depended upon the fact that it was one of the conditions of the charter itself, then the liability would have been avoided if, instead of forming a new company, the private individuals who bought all the franchises of the old Greenville & Columbia Railroad Company had held and operated the road as private and natural persons and without the formation of the new company.

I infer, therefore, that in the case of the *C. & G. R. R. Co.* v. *Gibbes, supra,* the court would not have held the assessment valid even if the corporation was formed after the passage of the railroad commissioners' act, unless in the opinion of the court the assessment was free from constitutional limitations in reference to taxes, and within the range of those requirements which the legislature had a right to impose by way of amendment, alteration, or repeal, or which it had a right to enact as to future or even existing corporations by virtue of the police power.   The struggle between corporations and the law-making power has been unremitting ever since the Dartmouth College case settled the question in favor of corporations that they were not subject to legislative will in this country as in England, but were protected from all interference under the constitutional provisions in reference to the inviolability of contracts.   The general practice since then has been to reserve, as has been done in this case, the power to amend, alter, or repeal.   While the extent of this power is still not clearly defined, it has been freely exercised and liberally construed.

Besides this reserved power of amendment, there is the "police power," "an inalienable attribute of sovereignty applicable to all corporations and persons alike, of which no State can by its leg-

islature divest itself." By this power "persons and property are subjected to all kinds of restraints and burdens." *Thorp* v. *R. R. Co.*, 27 *Vt.*, 140.. Art. XIV., sec. 1, of the Constitution of the United States cannot, in my opinion, be construed either to interfere with this reserved power to amend, alter, or repeal charters, or to cut-down the police power of the States. Under, perhaps, the joint operation of the power to amend and the police power of control, railroad companies have been compelled to submit to legislative control of rates of freight and fare of passengers. They have been compelled to expend material, labor, and money in fencing their tracks for the purpose of protecting stock from harm and their trains from accidents involving the safety and lives of the travelling public. The railroad commissioners have a function of the same kind, perhaps intended for a more extensive and thorough control of the operations of the railroads in their relations to the *public*. They are the great public highways for commerce and travel, established not only for the benefit of shareholders, but for the public benefit. *Munn* v. *Illinois*, 94 *U. S.*, 130. Is there any difference between making a litigant in court pay for the service of public officers rendered against his will and against his interest, and making the railroad companies pay for the services rendered in and about regulating the complicated and conflicting claims of themselves and the public ?

I therefore conclude that this assessment is not in violation of any provision of the constitution of 1868 in reference to taxation of property, or of the constitution of the United States ; that the full power to amend the charter of the plaintiff has been reserved ; that the subjection to the provisions of the railroad commissioners' act in common with other corporations is within the reserved power to amend ; and that the said act is also within the police power, if not within the power to amend.

I would prefer to have more decided convictions in a case of the importance of the one now under consideration, but I feel bound to resolve any doubts I may have in favor of the act of the legislature, satisfied that there is another tribunal which will correct any error I may make. It is therefore ordered and adjudged, that the complaint be dismissed with costs.

The plaintiff appealed upon the following exceptions :

I. For that his honor held that the decision of the Supreme Court of this State in the case of The Columbia & Greenville Railroad Company *v.* The Treasurer of Richland County was, by implication, applicable to this case.

II. For that his honor held that the assessment of taxes complained of was a proper enforcement of the police power of a State for the control of railroads.

III. For that his honor held that the act of March, 1869, consolidating The Charlotte & South Carolina Railroad Company and The Columbia & Augusta Railroad Company, had the effect of working a dissolution of the original corporations; and that thereby the charter of the new corporation became subject to "amendment, alteration, or repeal by the legislature at its will."

IV. For that his honor held that the assessment of taxes complained of was not in violation of section 1, of article XIV., of the Constitution of the United States.

V. For that his honor held that the imposition of the taxes complained of was not in violation of the requirements of the constitution of the State of South Carolina, that there should be a uniform and equal rate of taxation upon all property.

VI. For that his honor did not hold that the assessment and collection of taxes complained of were in violation of one or more of sections 12, 14, 23, and 36, of article I., and section 1, of article IX., of the Constitution of South Carolina; and,

VII. For that his honor did not hold that the collection of the taxes complained of was wrongful or illegal.

*Messrs. J. C. Haskell* and *H. N. Obear*, for appellant.

*Mr. Earle*, Attorney General, and *Mr. C. R. Miles*, contra.

October 18, 1887.   The opinion of the court was delivered by
MR. CHIEF JUSTICE SIMPSON.   Section 1453 of the General Statutes imposes liability in certain proportions upon the railroad companies of this State for the salaries of the officers known as railroad commissioners.   The appellant denies the constitutionality of this act, and claims exemption therefrom on that ground.

The appellant was brought into existence under its present

name in 1869 by the consolidation of two other companies previously chartered and in operation at that time as separate companies.  This consolidation was made by virtue of the act of March, 1869.  The two original companies which, by consolidation, made the appellant company, it is conceded, were not subject to the 41st section of the act of 1841, whereby the power to alter, amend, &c., certain charters granted by the legislature was reserved; on the contrary, said companies were expressly excepted from the operation of said section, thus giving them vested rights which could not have been interfered with by any subsequent legislation had they remained separate and distinct, and continuing to exercise the rights and powers conferred upon them in the original charters.  *Dartmouth College Case.*  The consolidation, however, in 1869, dissolved the two original companies and created an entirely new company—the appellant—with rights and privileges not dependent or derived from the charters of the original companies, but upon the act authorizing the consolidation and the law governing corporations at the time.

Now, at the time of this consolidation the constitution of 1868, and the act of 1841, in reference to corporations, were of force. The constitution (art. XII., section 1) declares "that corporations may be formed under general laws, but all such laws may from time to time be altered and repealed."  And further : "That the legislature shall regulate the public use of all franchises, and limit tolls, imposts, and other charges and demands under such laws."  Sec. 5.  The act of 1841 provided in section 41, "That it shall be deemed a part of the charter of every corporation created under the provisions of any general laws, and of every charter granted, renewed, or amended by act or joint resolution of the general assembly (unless such act or joint resolution shall, in express terms, declare the contrary), that such charter, and every amendment thereof, should always remain subject to amendment, alteration, or repeal by the general assembly."  Act of 1841, 11 *Stat.*, 168, now section 1361, General Statutes.

It is hardly necessary to discuss the question whether the appellant company, having been brought into existence in 1869, since the adoption of the constitution of 1868, and while the act of 1841, *supra,* was of force, is subject to amendment, altera-

tion, and repeal at the discretion of the legislature, there being no exemption from section 41 of the act of 1841 in the act under which the consolidation took place. The case of *Hoge* v. *The Railroad Company* (99 *U. S.*, 348) is full to this point, where the act of 1841 was construed, and where the court said: "Every charter amended or modified was subject to repeal, amendment, or modification. Such is evidently the meaning of the 41st section of that law, though the intention is inaptly expressed; and if an exemption from further legislative control had been originally acquired by the company, it ceased when the amendment to the charter was obtained." If such is the effect of a mere amendment, surely a consolidation of two companies into one, as was had here, thereby creating an entirely new company and destroying the others (*Shields* v. *Ohio*, 95 *U. S.*, 319), would bring the new company under the legislative control of the act of 1841, whatever may have been the vested rights of the previous companies.

It is perfectly clear, then, that the appellant company cannot successfully claim exemption from legislative control by virtue of any rights derived from its charter. Nor can it deny that the general assembly has general power to amend, alter, or repeal said charter, as provided in section 41 of the act of 1841, and in the article XII., section 1, of the Constitution of 1868. This was the contract under which said company was created, and it is bound thereby. In fact, the rights of all corporations are founded in contract, which must be construed and enforced as all other contracts, to wit, according to the intent of the parties. It was upon this theory that the great Dartmouth College Case was decided. There being no reservation of power applicable to that case, either in the charter itself, or in any general law upon the subject, the court was compelled to hold that the rights of the college, as specified in the charter, were matters of contract, and were therefore inviolate, and could not be assailed or impaired in any way by subsequent legislation.

It has been upon this theory, too, that many cases have since decided that where a corporation accepts a charter under a general law, or under a provision of the constitution of the State reserving control over all corporations created therein, or under

a special provision of the charter itself to that effect, it is subject to such control, and may be amended and altered, as in the judgment of the general assembly the public interests may demand. See *Black on Constitutional Prohibition,* sections 33, 34, *et seq.,* and the cases there cited.   And it was upon this theory also that the recent case of the *Columbia & Greenville R. R. Co.* v. *W. H. Gibbes* (24 *S. C.,* 60) was decided, in which the constitutionality of the act now under consideration was sustained as to said company—this court holding that said company having organized since said act was passed, had thereby contracted with reference thereto, and was bound by its provisions as a part of the act of incorporation.   And it is upon this theory that the appellant here must be held bound.   In fact, we can see little or no difference in the principle which controlled the court in that case and the one which must be applied here.   It is true, that the Columbia & Greenville R. R. Company accepted its charter after the general railroad law of 1878 had been enacted, and thereby incorporated its provisions into its charter as a part and parcel thereof, but what is the difference in principle in accepting a charter with certain stipulations therein, and in accepting one with a consent and an agreement, that the legislature granting said charter may insert such stipulations afterwards, if in its discretion it sees proper to do so?   They both rest upon contract, and both may be enforced under the general law of contracts.

According to this view, if the act complained of, and which has imposed a liability upon the appellant to pay its proportion of the railroad commissioners' salary, is a legitimate amendment under the act of 1841 and the constitution, then it can make no difference what it may be called—whether a tax for revenue, a police regulation, or a license fee.   Whatever it may be, the company has contracted to pay it; and if it claims the privileges and rights of its charter, it must take them with the burdens imposed.   It cannot enjoy the one and repudiate the other. So that it follows that the only question in the case is, has the general assembly in reference to the appellant transcended its power to alter, amend, and repeal the charters of corporations reserved in the constitution and the act of 1841, section 1361, of the General Statutes?

There is no doubt but that the appellant received its existence with full knowledge that this reserved power hung over it—a power which, at least so far as the terms of the reservation are concerned, was unlimited as to alteration, amendment, and repeal. And the question now is not whether such power exists, but whether the act in question has gone beyond it. We think this has been settled in the recent case of the Columbia & Greenville R. R. Company, *supra.* There the same act was in controversy and the same question raised and based very much upon the same ground. The court held, in substance, that the act was a part of the charter, inasmuch as the charter was granted and accepted after the passage of the act. If, then, the legislature could incorporate into the charter the provisions of the act imposing the liability complained of at the beginning, without violating the sections of the constitution relied on here as to taxation, &c., why could it not do so after the organization of the company as well, the reservation of power to amend, &c., having prevented the vesting of rights beyond the reach of such amendment ? The ground upon which we held that this could be done in the Greenville & Columbia case, was the consent of the company, thereby waiving all objection, constitutional or otherwise.

So here the appellant contracted to take its existence under an unlimited power in the legislature to alter, amend, and repeal. And it is too late now to complain. *Consensus facit jus.* It may be said, however, that this consent was given under the protection of the constitutional provisions invoked, and therefore it was never understood or agreed that these guarantees of the constitution, as to the rights mentioned, should be violated ; but that this reserved power of amendment referred to the ordinary amendments, &c., such as would not affect the substantial rights conferred. The power reserved is very broad, according to the terms of the act. It covers the whole subject, "amendment, alteration, and appeal," and there certainly is no limitation in the language used. Nor do we know where to fix the boundary, except it should not go beyond the ends to be accomplished or intended to be subserved by the reservation, which no doubt was regulation, control, and supervision, to the end that public interests might be protected as well as that of the corporations. We

do not see that the act in question transcends this boundary ; on the contrary, it seems to be within it.

The constitutional guarantees invoked were primarily, at least, for the protection of natural citizens—those who had rights before the constitution was adopted, over and above it, and for the protection of which government was instituted; and the builders of the government fearing to give it unlimited power, inserted in the constitution, the organic law of the government, certain guarantees as a bill of rights. A corporation, however, differs in many respects from a natural citizen. It has no natural existence or natural rights. It is a creature of the government, and by the act of government. It has life, if life at all, as a matter of grace, and can demand nothing. It is emphatically clay in the hands of the potter, and must take its life at the will of the government, or not at all. "Hath not the potter power over the clay ?" Besides, it can protect itself if it sees proper by simply refusing to enter into the contract proposed, or, if after having once accepted, by throwing up its charter if the subsequent burden imposed proves too onerous.

From our view of this case it is wholly unnecessary to follow the counsel into their able and interesting argument on the subjects of taxation, police regulations, and licenses, because, whether this assessment on the appellant is made and collected as the one or the other, it is yet made because the appellant has consented and contracted to pay it, in consideration of life and separate existence and large privileges granted; and if it claims these, it must submit to and abide the contract in its entirety.

But conceding that a corporation has the same right to invoke the sections of the constitution referred to, as a natural person would have, and to the same extent, does the act in question under that view violate said sections ? These sections are found in art. I., section 36, and article IX., section 1. The first declares that taxation upon property shall be *ad valorem*, and the second, that it shall be uniform. Does the act impose a tax on property, and is it objectionable because not "uniform" ? It is clearly not a tax on property assessed according to its value. It is a declaration in substance by the legislature that railroad companies may pursue their business upon condition that they shall

pay each a proportion of the salary of the railroad commissioners, the proportion being fixed by a uniform rule applied to each. It is, therefore, more in the nature of a license fee.    It is true that the amount collected is to go into the public treasury, and it is collected as a tax ; but it is intended to reimburse the State for these salaries paid by the State to the commissioners, who are, to some extent, officials of said companies, or at least whose duties appertain to said companies, and not to the general public ; and it therefore may be properly styled a license tax, collected and appropriated for the proper regulation· and benefit of the corporations paying it.    And being assessed upon all railroad corporations alike, it is "uniform," in accordance with the true meaning of the constitution.

But can a tax be imposed and collected other than upon property and according to its value ?    Is 'art. I., section 36, *supra*, exhaustive upon this subject ?    This question was fully and thoroughly examined and determined in *State* v. *Hayne*, 4 *S. C.*, 403, the court holding, after a most elaborate review and discussion of the whole matter in all its phases, that this section was not exhaustive as to the powers of the general assembly on the subject of taxation, and while, when a tax is imposed on property (which, it is admitted, is the general subject matter for taxation), it must be assessed upon the value of the property, and not otherwise, yet that the State was not limited to property as the only basis of taxation, and in that case a tax on the profession of law in the shape of a license fee was held constitutional.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.

MR. JUSTICE MCGOWAN.    I concur in the result, and hope to be able to express my views in a separate opinion, but will not now delay the judgment.

MR. JUSTICE MCIVER, *dissenting.*    Being unable to concur in the conclusion reached by the majority of the court, I propose to indicate as briefly as practicable, without undertaking any elaborate discussion, some of the reasons which forbid such concurrence.

In the first place it will be necessary to consider whether the question involved in this case has been concluded by the decision of this court in the recent case of the *Columbia & Greenville Railroad Company* v. *Gibbes,* 24 *S. C.,* 60; for although I did not concur in the conclusion there reached, yet that decision must and should be regarded as an authoritative decision of the point there involved, entitled to be respected and obeyed by every one, and I certainly would, readily and cheerfully, yield to its authority.    It does not seem to me, however, that the question now presented was decided by that case; on the contrary, as was said by the court in dismissing the petition for rehearing, "the question was necessarily limited to the corporation making it," and the court expressly declined, although urged so to do, to consider or determine the general question whether the 41st section of the act of 1882 (17 *Stat.,* 817), now incorporated in the General Statutes as section 1453, was unconstitutional, and confined their decision, in terms, to the question whether the Columbia & Greenville Railroad Company, which (it was assumed) had accepted its charter subsequent to the passage of the original act requiring railroad companies to pay the expenses of the railroad commission, could claim such act to be unconstitutional.

As I understand it, the decision in that case was rested solely upon the ground that inasmuch as the corporation there concerned had received its charter subsequent to the passage of the act of 1878 (erroneously—probably through a clerical error or misprint—cited in the opinion as the act of 1879), it must be regarded as having accepted the terms of that act as a part of its charter, and could not therefore repudiate it as unconstitutional. This, as it seems to me, rested upon an unfounded assumption, inasmuch as the act of 1878, by which railroad corporations had been originally required to pay the expenses of the railroad commission, had been expressly repealed by the act of 1882 (17 *Stat.,* 841), and an entirely new and different provision enacted, so that it was a mistake to assume that the exaction there complained of was made under an act which was spread upon the statute book at the time the company received its charter.    For assuming, what I have no doubt is the fact, that the company was chartered in 1880, the exaction or tax there complained of,

imposed by the act of 1884, could not have been made by virtue of the act of 1878, which had then been repealed, but must necessarily have been made by virtue of the act of 1882, which was *not* spread upon the statute book at the time the company received its charter in 1880.

But in addition to this, the provisions of the act of 1878 differed materially from those of the act of 1882, now incorporated as section 1453 of the General Statutes. By the former this exaction was not spoken of as a tax and was not collectible as such, but could only be collected by suit in the Court of Common Pleas in the name of the comptroller general for the benefit of the railroad commission; whereas in the latter it was collectible "in the manner provided by law for the collection of taxes from such corporations, and shall be paid by the said county treasurers, as collected, into the treasury of the State, in like manner as other taxes collected by them for the State." So that the law which was on the statute book at the time the Columbia & Greenville Railroad Company received its charter, purported to require all railroad corporations to pay a proportionate part of the expenses of the railroad commission, and made them liable to an action at law in case of their refusal so to do; but this law having been subsequently repealed and another enacted in its place, subsequent to the granting of the charter to that company, whereby a tax, as I understand it, was imposed upon all railroad companies to an amount sufficient to defray the expenses of the railroad commission, it did not then, and does not now, seem to me to be within the limitations of the taxing power as prescribed by the constitution. Hence I did not then, and cannot now, concur in the conclusion reached by a majority of the court.

Thus while, according to my view, the general question now presented was really involved in the former case, yet the majority seemed to think otherwise, and rested their conclusion upon another, and as I think untenable, ground, to wit, that the corporation there concerned having accepted its charter, with this provision requiring all railroad companies to pay proportionate parts of the expenses of the railroad commission, could not afterwards resist such requirement upon any ground.

Now, while it is quite true that the legislature may, when application is made to it for a charter, either grant or refuse such application, as may be deemed best for the public welfare, yet it does not follow that they may impose *any* conditions, or insert in such grant *any* privileges or immunities, that they may see fit to do. Like all other departments of the government, the legislature is confined by the constitution to certain limits, and therefore they can only impose such conditions and confer such privileges as fall within those limits. They cannot confer upon a corporation, except such as are specified in the constitution, the privilege of total exemption from taxation, nor can they impose, as a condition of the charter, the requirement that a corporation shall pay taxes on its property at double the rate imposed upon property held by others ; for in the one case as well as in the other the legislature would transcend the limits prescribed to it by the constitution.

The idea is thrown out in the opinion of the majority, though I do not understand the point to be decided, that a corporation being the mere creature of government, deriving its existence from, and holding its rights and privileges (except where protected by contract) at the will of the legislature, cannot invoke the protection of any constitutional guarantees which were inserted in the constitution for the protection of natural citizens, and were not designed to afford any protection to mere artificial persons like corporations. If this be so, it is a little singular that such a doctrine, so far as I have been able to discover, has never been advanced, much less decided, in any case. On the contrary, the reverse has been necessarily assumed in numerous cases, especially in the Supreme Court of the United States. The many cases in which corporations have successfully invoked the protection of the contract clause of the constitution, could only have been decided upon the assumption that corporations, as well as natural persons, were entitled to the protection afforded by that constitutional guaranty. So the many cases in which questions of the jurisdiction of the United States courts depending upon citizenship of the parties have been decided, all rest upon the idea that corporations, just like natural persons, may enforce their

contracts or rights of property, and are entitled to the same protection under the constitution and laws.

In the *United States* v. *Amedy* (11 *Wheat.*, 392), the prisoner was indicted for destroying a vessel with intent to prejudice the underwriters, who, in that case, proved to be a corporation, and it was contended that a corporation was not a person within the meaning of the act of congress, but the court held otherwise, Mr. Justice Story saying: "That corporations are in law, for civil purposes, deemed persons is unquestionable. And the citation from 2 *Inst.*, 736, establishes that they are so deemed within the purview of penal statutes." The same doctrine is fully recognized in *Beaston* v. *The Farmers Bank of Delaware*, 12 *Peters*, 102, and *Bank of Augusta* v. *Earle*, 13 *Peters*, 519. In *Santa Clara Company* v. *Southern Pacific Railroad Company*, 118 *U. S.*, 394, the court seemed to be so well satisfied upon the point that they declined to hear argument on the question whether the provision in the fourteenth amendment to the constitution of the United States. which forbids a State from denying to any person within its jurisdiction the equal protection of the laws, applies to corporations, the Chief Justice saying: "We are all of opinion that it does."

It seems to me clear, therefore, that the plaintiff has the same right to invoke the protection of the provisions of the constitution as if it were a natural person, and the question is, whether section 1453 of the General Statutes, purporting to impose upon this company the burden of paying a proportionate part of the expenses of the railroad commission, is in violation of any of the provisions of the constitution of this State or that of the United States.

I shall assume, for the purposes of this discussion, that by reason of the consolidation of the two companies under the act of 1869, the plaintiff company subjected its charter "to amendment, alteration, or repeal by the general assembly," as provided by section 1361 of the General Statutes, though I do not understand that such would be the result under the provisions of the constitution. The provisions relied upon for that purpose are sections 1 and 2 of art. XII. of the Constitution; but section 1 applies only to corporations "formed under general laws," and

this corporation was not so formed, but by special act; and section 2 only declares that the property of corporations shall be subject to taxation, without any reservation of the right to amend, alter, or repeal their charters. Assuming, then, that the legislature has the right to tax this company and to amend, alter, or repeal its charter, the inquiry is, whether the exaction here complained of is such a tax as the legislature has a right, under the limitations of the constitution, to impose, or is the section (1453 of the General Statutes) such an amendment, alteration, or repeal of the charter of the plaintiff as the legislature has a right to make.

The manifest object of the exaction complained of is to provide a fund for the payment of the salaries and expenses of certain officers and agencies of the State government. The salaries of the railroad commissioners are fixed by law, and are required "to be paid from the treasury of the State in (the) manner provided by law for the salary of other State officers," and they are required to "take the oath of office provided by the constitution, and the oath against duelling" (section 1451 of General Statutes as amended by the act of December 21, 1882, 18 *Stat.*, 12); and the proportion of these expenses required of each railroad corporation is required to be *assessed* by the comptroller general on each of such corporations, and the same "shall be collected by the several county treasurers, in the manner provided by law for the collection of taxes from such corporations, and shall be paid by the said county treasurers as collected into the treasury of the State, in like manner as other taxes collected by them for the State." The exaction is, therefore, made for the same purpose as *other* taxes, it is collected in the same manner, and is disposed of in like manner, as *other* taxes. It is, therefore, a part of the revenue of the State just like any other taxes; so designated and so treated by the legislature itself. If this is not so, then the exaction plainly violates section 23 of art. I. of the Constitution, which declares: "Private property shall not be taken or applied for public use, or for the use of corporations, or for private use, without the consent of the owner, or a just compensation being made therefor."

Regarding it, then, as a tax, the next inquiry is, what kind of a tax is it? Is it a license tax, or a tax on an avocation, or rather

on the privilege of exercising an avocation, or is it a tax on property? It does not even purport to be a license tax and has none of the characteristics of such a tax. A license tax seems necessarily to involve the idea that without the payment of the tax thus imposed and the procurement of the required license it would be unlawful to pursue the avocation or carry on the business subjected to such a tax. It is a purchase of the right to carry on such a business. But there is nothing in the act now under consideration which in the remotest degree indicates that such was the intention of the legislature, and hence I do not see how it is possible to regard the exaction complained of as a license tax. But even if it could be regarded as a license tax, there would still be a question as to the constitutionality of the act by which it is imposed; for while it has been held in several cases (*State* v. *Hayne*, 4 *S. C.*, 403; *State* v. *Columbia*, 6 *Id.*, 1; and *Charleston* v. *Oliver*, 16 *Id.*, 47), that a tax on professions or occupations is not forbidden by the constitution of the State, it does not by any means follow that the legislature has the right to single out one particular avocation, or rather, as in this case, one branch of an avocation. For the avocation of the plaintiff company is that of a common carrier, and the exaction is not required from all common carriers, leaving all other avocations and professions free from the burden of such exaction.

The fundamental principle, running through all the provisions of the constitution in reference to taxation, is that of uniformity and equality, and this principle cannot be disregarded in the imposition of taxes of any kind. Section 1 of art. IX. provides that: "The general assembly shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property," &c. Now, these words advance two ideas, as is well said by Willard, J., in *State* v. *Hayne*, *supra*, "First, equity in all taxation and assessment, and second, valuation, as the means of securing such equality in the case of taxes on property. The first clause, namely, 'the general assembly shall provide by law for a uniform and equal rate of assessment and taxation,' is not by its terms applicable alone as peculiar to taxes on property. It does not use the word value, which is significant

to taxation as applied to property. That expression occurs in the second clause in connection with the subject to which it belongs, namely, taxation of property. These clauses are connected by the conjunction 'and,' accordingly their grammatical relations admit of their bearing [having?] independent force and effect, if the nature of the subject matter admits of it."

In other words, the language above quoted contains two separate and independent mandates to the legislature. 1st. That they shall provide by law for a uniform and equal rate of assessment and taxation of all kinds. 2nd. That they shall prescribe such regulations as shall secure a just valuation of all property. And in section 33 of art. II., there is another mandate, requiring that "all taxes upon property, real or personal, shall be laid upon the actual value of the property taxed, as the same shall be ascertained by an assessment made for the purpose of laying such tax." While, therefore, the legislature may impose taxes other than those on property, they can only do so by a uniform and equal rate, which, in case of property, is to be determined by the actual value thereof, as ascertained by an assessment made for that purpose. But as it seems to me clear that the exaction here complained of cannot, in any sense, be regarded as a license tax, I do not deem it necessary to pursue this branch of the discussion.

If, then, this exaction must be regarded as a tax upon the property of the plaintiff corporation, then it is quite clear that it is in violation of the provisions of the constitution for two reasons. 1st. Because it is not laid upon the value of the property, as ascertained by an appraisement made for the purpose (*State v. Railroad Corporations*, 4 *S. C.*, 376); and 2nd. It would be a double tax upon the same property; for it must be assumed, in the absence of any evidence to the contrary, that the officers charged with the duty of collecting the ordinary taxes from this company have performed that duty, and hence to require such company to pay this additional tax upon its property would be so plainly in violation of the provisions of the constitution as to need no further remark.

It may be contended, however, that it is not a tax upon the tangible property of the company, such as has already been subjected to the ordinary tax, but is a tax upon the franchises of

the corporation, the value of which is measured by the income derived from the exercise of such franchises. If certain franchises of corporations are property, as has been held in *Society for Savings* v. *Coite*, 6 *Wall.*, 594; *Provident Institution* v. *Massachusetts, Ibid.*, 611; and *Hamilton Company* v. *Massachusetts, Ibid.*, 632; and if they are the subject of mortgage and sale, as held in *New Orleans, &c., R. R. Company* v. *Delamore*, 114 *U. S.*, 501, then I see no reason why such franchises may not be taxed like all other property, provided their actual value has been ascertained by an assessment made for that purpose, as required by the constitution. But is this a tax upon the franchises of this corporation? It does not purport so to be, and if it did, the tax has not been laid upon the actual value of the property proposed to be taxed, as ascertained by an assessment made for that purpose—the franchises of the corporation—but it is proportioned to the gross income of the company, which is manifestly due to the tangible property used in producing such income, as well as to the intangible property, the franchises of the corporation; for it is quite certain that the franchises without the aid of the tangible property, which has already been taxed, would yield no income.

As was held in *State* v. *Railroad Corporations*, 4 *S. C.*, 376, an act which requires every railroad company within the State to pay to the treasurer for the use of the State a sum of money, determined by the length of its road, is a tax upon property, and is unconstitutional and void because not laid upon the value of the property, so it seems to me that the exaction here complained of is in effect a tax upon the property of the plaintiff company, and unconstitutional because not laid upon the value of the property. But even regarding this as a tax upon the franchises of this corporation, as contradistinguished from its tangible property, and that the value of such franchises can be properly measured, and were intended to be measured by the gross income of the company, then it could only be required to pay the same rate of taxation upon the value of such property as is imposed upon all other property, and not a proportionate part of the expenses of certain officers and agencies of the government. In addition to this a tax upon the franchises of one class

of corporations, while all other corporations are not taxed upon their franchises, would violate that fundamental principle of uniformity and equality required by the constitution.

If it should be said that this is a tax upon the income of railroad corporations, and not upon their property, either tangible or intangible, the proposition would be met by the same objection of want of uniformity, inasmuch as no other corporations or persons are subjected to such a tax.

Again, it is contended that the legislation here brought in question can be defended as an exercise of the police power. The power thus invoked is, no doubt, very extensive, and very healthful, if not absolutely necessary to every well ordered community, but its limits do not seem to be very well defined, and are, perhaps, indefinable with accuracy and precision. But I do not find that it has ever been regarded as furnishing any warrant for the imposition of taxes. I can understand how it may be resorted to as a justification for legislation regulating railroads or other public enterprises, which, otherwise, would seem to be an unwarrantable interference with private property, but I cannot understand how it can authorize the extension of the taxing power beyond the limits prescribed by the constitution. As is said by Judge Cooley, in his valuable work on Constitutional Limitations, page 577 : "The maxim, *sic utere ut alienum non laedas*, is that which lies at the foundation of the power; and to whatever enactment affecting the management and business of private corporations it cannot fairly be applied, the power itself will not extend." And again that eminent author says : "Even a provision in a corporate charter, empowering the legislature to alter, modify, or repeal it, would not authorize a subsequent act which, on pretence of amendment, or of a police regulation, would have the effect to appropriate a portion of the corporate property to the public use."

In view of these principles, it seems to me too plain for argument that this legislation cannot be justified as an exercise of the police power. How the property of another is to be injured by the non payment, or protected by the payment, of the tax imposed, it is impossible to conceive. The payment of such tax is not even essential to the existence of the railroad commission;

for, as we have seen, the salaries of the commissioners are paid out of the State treasury, just like those of other State officers, and whether this tax is paid or not, they get their salaries all the same. I do not see how the maxim, *sic utere, &c.*, can "fairly be applied" to the act under consideration. There is no word in the act which indicates that its purpose was to lay any restraint whatever upon railroad corporations in the use of their property or franchises, and certainly the effect of it would not be to throw any protection around the rights of persons or property. It is simply an act requiring a particular class of tax-payers to pay the entire amount of the salaries and expenses of certain officers and agencies of the State government which it has been deemed necessary to establish for the public welfare, which amount is to be collected and paid into the State treasury in the same manner as "*other* taxes."

Finally, it is urged that this legislation can be justified as an amendment to the charter of the plaintiff company, which the legislature has reserved the right to make; and that the plaintiff, having accepted its charter with full knowledge of this reserved right on the part of the legislature, must be regarded as assenting to and accepting *any* amendment of its charter which the legislature might see fit subsequently to make, upon the principle *consensus facit jus.* Conceding that, by virtue of section 1361 of the General Statutes, the legislature has reserved the right to alter, amend, or repeal the plaintiff's charter, it does not follow that the legislature has the right to make *any* amendment they might see fit to make, regardless of the restrictions thrown around the exercise of legislative power by the organic law of the land; and certainly it would not follow that, under the guise of an amendment to the charter, the legislature could utterly disregard the mandates of the constitution in reference to the exercise of the taxing power, and go beyond the limits prescribed for the exercise of such power. The charter of a corporation can only be amended by an act of the legislature, and it is not everything which assumes the form of an act of the general assembly which has the force and effect of an act. If it is in conflict with any of the provisions of the constitution, it is not an act, no matter what may be its form. It is an absolute nullity.

Hence whenever the legislature undertakes to make an amendment of the charter of a corporation by an act which has not been passed in the manner prescribed, or the terms of which are in conflict with some provision of the constitution, there is no amendment, because the act purporting to make such amendment is a nullity.    Thus if the legislature should, in the most formal manner, pass an act declaring that the charter of a certain corporation should be so amended as that the half or the whole of its property should be turned over to another corporation, there could be no doubt that such an act would be an absolute nullity, being in direct conflict, not only with the plainest principles of justice, but also with the express terms of section 23, art. 1, of the Constitution, and hence there would be no amendment of the charter of such corporation.    So if section 1453 of the General Statutes could be regarded as a proposed amendment to the charters of all the railroad corporations in the State, whose charters are subject to legislative control, though there is not a single word in the section which indicates that such was the purpose or intention of the legislature, yet if the provisions of such section are in conflict with the provisions of the organic law, as I think they are, in reference to the taxing power, then the section is an absolute nullity and there is no amendment to the charter of the plaintiff company.

But it is said that the company having accepted its charter, with full knowledge of the fact that the legislature had retained the right to alter and amend it, must be regarded as waiving the protection of any constitutional provision, and consenting, in advance, to any amendment the legislature might see fit to make, and, therefore, it is bound thereby as matter of contract.    It must be remembered, however, that while the company, when it accepted its charter, must be regarded as having done so with notice of the fact that the legislature reserved the right to amend, yet it, at the same time, had notice of the several provisions of the constitution placing limitations upon the legislative power, and, therefore, it had a right to assume that the legislature could and would only exercise the reserved right to amend, within the limitations prescribed by the constitution.    Hence it cannot properly be said that the corporation, by accepting its charter,

with notice of the reserved right to amend, consented that the legislature might make *any* amendment to its charter, but only such as it could make within the limitations prescribed by the constitution.  It could not assume, or even anticipate that the legislature would violate the law of its existence, and undertake to do that which the people, in their sovereign capacity, had forbidden them from doing.

I think, therefore, that the judgment below should be reversed and the case remanded for a new trial.

Judgment affirmed.

The plaintiff filed a petition for rehearing, but it was refused *per curiam*, January 6, 1888, the court saying: "We have carefully considered this petition, and finding that no material fact or important principle of law has been overlooked, the petition is dismissed."