CHICAGO & GRAND TRUNK RAILWAY COMPANY v.
SOPHIE S. TURNER ET AL.

*Railroad bonds—Coupons—Cancellation—Sale.*

Complainant seeks to enjoin a suit at law for the collection of
coupons detached from railroad bonds, when past due, by the
president and majority stock and bond holder of a railroad
company, and delivered to his wife, who paid no considera-
tion for the same.  The bonds were afterwards sold by the
husband, and passed into the hands of complainant, all parties
supposing that the sale covered all coupons attached and
detached and not paid and canceled, and upon a review of the
testimony it is held that such intention must prevail as against
the wife, who was not an innocent purchaser for value, and
that the coupons delivered to her must be considered as paid
when cut from the bonds and so delivered.

Appeal from Ingham.  (Peck, J.)  Argued November
14 and 15, 1889.  Decided December 28, 1889.

Bill to enjoin suit at law brought for the collection of
certain railroad bond coupons.  Complainant appeals.
Decree dismissing bill reversed, and one entered in con-
formity to prayer of bill.  The facts are stated in the
opinion.

*E. W. Meddaugh* and *M. V. & R. A. Montgomery*
(*Ashley Pond* and *Henry A. Harmon,* of counsel), for
complainant.

*Frank L. Dodge* (*C. P. Black,* of counsel), for defend-
ants Turner.

MORSE, J.  February 28, 1885, the defendant Sophie S.
Turner, wife of the defendant James M. Turner, com-
menced suit against complainant in the circuit court for
the county of Ingham to recover the amount of 290

coupons, with interest, belonging to, but detached from, bonds of the Chicago & Northeastern Railroad Company. This suit is instituted to enjoin said suit of Sophie S. Turner, and for the surrender of said coupons to the complainant for cancellation, and the discharge of the mortgage securing the same, on the ground that the coupons have been paid. The claim of complainant, as set forth in its bill of complaint, is substantially as follows:

1. That it is incorporated under the laws of Michigan, Indiana, and Illinois, by consolidation of different railroads, including the Chicago & Northeastern Railroad Company.

2. That before the consolidation the last-named company issued its bonds to the amount of $1,250,000, under date of March 1, 1875, with interest coupons attached for half-yearly interest, at 7 per cent. per annum, secured by first mortgage on the road.

3. That Elijah W. Meddaugh is the trustee in the mortgage, succeeding John E. Miller, the original trustee. These first three propositions are admitted by the answer.

4. That complainant, since its organization, has acquired and canceled all the bonds and coupons, except those involved in this suit.

5. That on August 16, 1879, Joseph Hickson purchased of W. H. Vanderbilt bonds, including their unpaid coupons, of the Chicago & Northeastern Railroad Company, to the amount of $1,100,000, the face value of the bonds; that these bonds, and all their unpaid coupons, had been previously sold to Vanderbilt by James M. Turner, the defendant; that, when delivery of the bonds and coupons by Vanderbilt to Hickson was made, Turner was present, and that the bonds and coupons were only partly examined at the time; that there were some loose coupons, and other coupons of similar date were attached to the bonds, and that, an explanation of this being asked, Turner said that all coupons not attached to the bonds or with the loose coupons would be found in the books of paid and canceled coupons of the company; that, in consequence of this assurance, the coupons were not counted or further examined, but the consideration money was paid by Hickson to Vanderbilt, to wit, $540,-

-000, and delivery of the bonds and coupons accepted as in accordance with their agreement.

6. That, within a few days after the delivery of the bonds and coupons to Hickson, they were examined and counted, when it was found that 290 of the past-due coupons of the bonds delivered, amounting to $10,150, were missing, of which notice was immediately given to Vanderbilt.

7. That in September, 1880, these coupons were presented by Russell Sage to the complainant, and payment demanded; that Sage finally became satisfied that the coupons belonged to the bonds bought of Vanderbilt by Hickson, and abandoned the claim; that Vanderbilt was at once informed by the complainant of the holding of the coupons by Sage, and he assured complainant that he (Vanderbilt) would procure and deliver them to it.

8. That complainant relied on this assurance, and heard nothing of the coupons until January, 1885, when it learned that Turner contemplated bringing suit; that neither Turner nor his wife ever demanded payment of said coupons of complainant, nor was it aware that they, or either of them, had them, or claimed to own them, until as above stated.

9. Sets up the commencement of suit by Sophie S. Turner.

10. That in purchasing the bonds and coupons of Vanderbilt, Hickson was acting for the promoters of the complainant corporation, and that after complainant's organization, in consideration of the payment to him of the sum paid to Vanderbilt for the bonds and coupons, Hickson assigned and transferred to the complainant all the bonds and coupons thus acquired by him, including his legal and equitable right to the coupons involved in this suit.

11. That complainant requested the trustee in the mortgage to discharge it of record, which he declined to do because of the pending claim on these coupons.

It is also charged by the complainant in its bill that Turner formerly held and owned the bonds to which said coupons belonged; that, while so owning them, he pledged or deposited them, with other bonds and coupons of said issue, with Russell Sage, as security; that, while they were in the possession of Sage, Turner sold them to Vander-

bilt, with the other bonds and coupons subsequently sold and delivered by Vanderbilt to Hickson, but the interest coupons in this suit were by mistake not withdrawn by Turner from Sage, and not delivered to Vanderbilt, although paid for by him; that it was supposed and intended by both Vanderbilt and Turner that they were delivered; that Turner afterwards received the coupons from Sage, but instead of delivering them to Vanderbilt, as he should have done, he conceived the idea of presenting them as a claim against complainant, and in pursuance of this dishonest purpose passed them over to his wife, that she might collect them in her name, and appear as a good-faith purchaser of said coupons.

The defendants James M. and Sophie S. Turner answered, neither admitting nor denying the fourth allegation of complainant's bill. They deny that Hickson purchased any of the coupons involved in this suit, or that James M. Turner had previously sold or agreed to sell any of them to Vanderbilt, or that he ever acquired them in any way. And Sophie S. Turner says she knows nothing of James M. Turner being present when the bonds and coupons were purchased by Hickson of Vanderbilt.

Turner answers, denying that he was present when such bonds and coupons were turned over to Hickson, or witnessed the same, though he was present when such delivery was agreed upon. But, answering more fully in this behalf, he says the purchase of said bonds from said Vanderbilt by said Hickson embraced also, for the same consideration or price, the purchase by said Hickson of said Vanderbilt of a large amount of the capital stock of said Chicago & Northeastern Railroad Company, to wit, 7,000 shares of such stock, of $100 each, being seven-tenths of all the stock of said company, which he, said Vanderbilt, had for sometime held and owned, and which had

given him a controlling interest in .said company and said railroad, and which he, said Hickson, desired to purchase or acquire for the express purpose of controlling the affairs of said company and said railroad.

That this defendant was then president of said company, and superintendent of its said railroad, and for a long time had managed and operated the same; and that his term of office as such president would not expire until the month of May following the sale of said stock and bonds to said Hickson; and that, after the terms of such purchase and sale had been fully agreed upon and concluded, this defendant was sent for by said Vanderbilt to go to New York, to know whether he would consent, at his request as such principal stockholder, to relinquish control of said railroad by resigning his said office, in view of said sale; that he went to New York for that and no other purpose, and upon such request being made he acceded to the same, and relinquished and surrendered such control, and resigned his said office; that while in New York for the single purpose above expressed he happened to be present when the business of turning over the stock, bonds, and coupons so purchased and sold, and the manner of paying for the same, were agreed upon; but was not present when such payment was actually made and accepted, and said stock, bonds, and coupons were actually delivered over to the persons acting for said Hickson, nor were said bonds counted in his presence, or the coupons belonging thereto produced for inspection or examination; nor can he state from his own knowledge, or anything he learned at the time, whether any of said coupons were contained in envelopes. Denies that said bonds or coupons were counted in his presence, or that it was then observed that any coupons had been severed from said bonds, or that he had anything to do

with making or conducting said sale, or delivering the property.

He denies that any explanation was asked of him about missing coupons, or that he replied that all past due and detached coupons not found in envelopes then present would be found in the book of paid and canceled coupons, in the possession of said railroad company. Admits that inquiry was made in his presence respecting the coupons belonging to the bonds so sold, but he was then unable, as he then explained, to state certainly in relation to them, but did state that the books of the company at Lansing would fully show the facts, and that it was his impression that the coupons belonging to said bonds would be found either with Vanderbilt or pasted in the book of canceled coupons at Lansing; that said statements, though erroneous, as he has since learned, were made in the utmost good faith; and he expressly denies that Vanderbilt assumed to sell, or Hickson to buy, or that he did actually purchase or pay for, the past-due coupons in question, but only such past-due coupons as then belonged to and were held by Vanderbilt. Denies that said purchase was made in reliance upon anything that was said by him in reference to these coupons, or "in consideration of the delivering of said bonds and all of the coupons thereof unpaid," as alleged in complainant's bill.

The defendants admit that Russell Sage presented the coupons in September, 1880, for payment, but deny that he abandoned his claim upon them. They admit that James M. Turner formerly owned the bonds to which the coupons in question were attached, but deny that they were pledged to Sage or sold to Vanderbilt, as stated in the bill, or that the coupons were left in Sage's hands by mistake. Deny that said coupons were ever sold, or

intended to be sold, or agreed to be sold or transferred or pledged, to either Sage or Vanderbilt. Deny any fraud, or purpose of fraud, in the transfer of these coupons to Sophie S. Turner.

They state her acquisition of these bonds as follows: Turner was one of the original promoters of the Chicago & Northeastern Railroad Company. Was a long time its president and superintendent. Invested largely in its stock, and became the owner of a large majority in amount of the capital stock. January 28, 1878, he sold 750 of these bonds, but not including any from which these coupons were taken, to William H. Vanderbilt, and 5,250 shares of the capital stock, at $100 each, $1,000,-000 being the entire capital stock of the company, at the rate of $555 for each bond, including said stock. This gave Vanderbilt a majority of the stock and first mortgage bonds of the company. That he entered at the same time into a contract by which Vanderbilt had the right of a "call" for 250 other of said bonds, and 1,750 other of said shares of stock, at the rate of $555 for each bond, including said stock, on January 12, 1879, 10 days' notice being given of his election to take them; and Turner had the right to "put" or deliver the same number of bonds and stock, at the price named, on the same day, giving like notice.

That on March 30, 1878, James M. Turner, being the owner and holder of 250 of these bonds, of $1,000 each, and the March, 1878, coupons not being paid, Sophie S. Turner, at his request, cut off said coupons, and James M. Turner delivered them to his wife, making her a gift of the same; that she accepted said gift, and has ever since held said coupons as her property. These 250 coupons form a part of the 290 in question in this suit.

April 4, 1878, Turner sold the 250 bonds, from which these coupons had been detached, to Russell Sage, of New

York, for $125,000, subject to the contract of "put" and "call" with Vanderbilt; that, while said bonds were in the hands of Sage, the September, 1878, coupons became due. Vanderbilt, being the owner of a majority of the stock of the Chicago & Northeastern Railroad Company, was interested in their payment, and the same were taken up and paid by Turner with money furnished by Vanderbilt. October 9, 1878, Turner sold and delivered 20 other bonds to one Bingham with all the unpaid coupons thereon, except those falling due March, 1877, and September, 1877, which he had detached before the sale, and given to his wife as her property. These coupons, 40 in number, have ever since been held by Sophie S. Turner as her property, and are now so owned and held by her, and are the remaining coupons involved in this suit. That none of these 290 coupons now held by Mrs. Turner were ever sold to Sage, Bingham, or Vanderbilt, or any other person, or disposed of in any way save this gift to Mrs. Turner.

Turner further answers that, after this gift to his wife, he gave no further thought or attention to this matter of the coupons, and never saw or knew anything of them until the month of August, 1880, and had forgotten all about them at the time he was in New York, when the bonds and other coupons were turned over to Hickson by Vanderbilt. In September, 1880, he sent these, with other coupons belonging to him, to Russell Sage for collection of complainant. As to the coupons in question here, he acted for and in the interest of his wife, but requested said Sage to present them all in Sage's name, and to remit the proceeds to him. That all the coupons were paid, and the proceeds remitted, except these coupons now in controversy. The defendants Turner deny all unlawful combination and fraud charged in the bill.

Upon the issue thus joined by bill, answer, and repli-

cation, proofs were taken. Upon hearing of the proofs the court below dismissed complainant's bill. Complainant appeals.

It very clearly appears, not only from the pleadings, but from the proofs, that when Hickson purchased the bonds from Vanderbilt he supposed that he was getting not only the bonds with the coupons not yet due, but also all the past-due coupons not paid and canceled. It is equally clear that those acting for Vanderbilt also supposed that Vanderbilt was selling and delivering to Hickson what Hickson supposed he was buying and receiving. It is also undisputed that James M. Turner shared with the others in this supposition. It is plain that it was the intention of all the parties concerned in the deal, including Turner, who was then acting as president and superintendent of the Chicago & Northeastern Railroad under Vanderbilt, who owned and controlled it, to pass over in New York on August 16, 1879, $1,100,000 of the bonds of said railroad company, and a majority of the capital stock thereof, and that these bonds were to carry with them all the unpaid coupons, due or past due, attached or detached, not canceled, and that the deal would not have been consummated on any other basis. This deal took the control of this railroad out of the hands of Vanderbilt, and placed it under the control, management, and ownership of the complainant, for whom Hickson was acting. When it was closed, the complainant was possessed of all the bonds of the company save $150,000, which were in litigation. The 290 coupons in this suit without question belonged to the bonds transferred by Vanderbilt to Hickson. If Vanderbilt owned them at the date of the transfer, they undoubtedly passed to Hickson, or, if they had been paid or canceled at that time, the complainant is entitled to relief.

The question, then, is, did Vanderbilt own them, or did he have the right to sell them at the time of the transfer, or were they in effect paid and canceled? And in this connection it becomes material to inquire into the position occupied by Turner, his, relations with Vanderbilt, and his part in the transaction, and his conduct afterwards, as shown by his own testimony, oral and written.

While no charge of active fraud in this case can be successfully maintained against Mrs. ' Turner, yet she acquired these coupons, after they were past due, for no consideration, and it is evident that she put at the time little, if any, value upon them. She laid them away in her desk, and never thought of them for two years, when, hearing her husband and his attorney, Mr. Seager, talking about missing coupons, she was reminded of them, and going to her desk took them out, and handed them to her husband. She is not certain that she ever had them again. In all of the subsequent proceedings in relation to these coupons her husband has acted as he saw fit about them. Her equities in this case must be governed entirely by the equities of her husband, and she must stand or fall with him. If this gift had been a *bona fide* gift of something valuable, to the amount of over $10,000, the face of the coupons, or even half or less of it, we think that they would not have been laid away and forgotten by both husband and wife, and no thought whatever given to them for two years, and that the first two years following the gift.

Turner testifies that he told his wife that if she would cut them off she might have them, but the reason of cutting them off was not to make a gift to his wife, but because he thought the bonds which he was about to sell would sell better with these past-due coupons detached than with them attached. In other words, the bonds

were worth more without the coupons than with them. What, then, must have been the value of the coupons in his estimation? But we shall consider further his idea of the value of these coupons at the time they were severed, when we examine his testimony as to the transaction.

It appears from the testimony of Mr. Turner that the bonds of the Chicago & Northeastern Railroad Company were issued of date March 1, 1875, in the aggregate sum of $1,250,000. It is further shown by his answer, as well as his evidence in his own behalf in the case, that he was one of the original promoters of the road, and one of the most active men in building it from Lansing to Flint; that he invested largely in its stock, and before his sale to Vanderbilt owned or controlled a large majority of the capital stock and bonds of the road, and was not only the president, but the supreme manager, of the road. During such ownership and control the coupons coming due upon the bonds were considered of but little, if any, account. Turner says:

"These coupons during some of those years were not regarded matters of such great importance; the books will show the fact that the Chicago & Northeastern, while it was organized as a company, *never paid a coupon* to anybody. Here was a large mass of coupons accrued on the $1,250,000 bonds every six months; these coupons were never paid by the company, and it was not necessary that they should be retired. I and my friends, holding and owning quite or very nearly all the bonds, and all the stock, if we paid the coupons it was simply a transfer to ourselves, so that they were of just as much value as though they had been paid, because if they were paid we paid them, and perhaps that, in a measure, accounted for my not remembering distinctly about every one of these coupons. For instance, when the question would be directed to me, quite naturally it would embrace all the coupons of the $1,250,000 bonds, and I made the remark that while the books of the company at Lansing would show about it, my impression was that the Vanderbilt bonds or

coupons would be found there; that I was in the main correct about it; that out of that enormous mass of coupons I was exactly right, except as to the 290."

In other words, while Turner was owning and running the road the coupons were not paid, were considered of no value as they came due, and were not all retired. Some were cut off and pasted on the company's books at Lansing, and considered canceled, and that was the reason he stated, as he says, at New York, at the time of the transfer to Hickson, as follows:

"I was asked about it, and I told them that, while I had no *memoranda* to show about the numbers of these bonds, I had no recollection of any coupons unpaid that would not be there with Mr. Vanderbilt, or pasted in the coupon books at Lansing; but that * * * it was my impression that there were no coupons outstanding, except what Mr. Vanderbilt had there, or except what were pasted in the coupon books in Lansing, and was under that impression until these coupons were afterwards discovered."

He further says:

"While I allowed that impression to go forth there, I did so in the utmost good faith, and believing there was nothing that was not there or in New York. I found afterwards there were these coupons outstanding which had never been paid, and the sale made by Mr. Vanderbilt was a sale of all the bonds and coupons which he owned, and which he had ever owned; but, as you see by this contract, these coupons [the 290 in suit] had never been owned by Mr. Vanderbilt, and were not transferred by any sale that he could make."

It therefore clearly appears from Turner's testimony that, while he and his friends controlled the road, the coupons on these bonds, which they also owned, were considered of no value. When they fell due they were not paid; for, as Turner testifies in another place, it would simply be "taking money out of one pocket and putting it in the other." But they were, some of them,

severed from the bonds, and pasted in the company's coupon book, the same as if they had been paid. And it is evident from Turner's testimony that if he had noticed these 250 unpaid coupons for March, 1878, upon these bonds pledged to Sage, and subsequently taken under the " call " by Vanderbilt, at Lansing, before leaving the office of the company, they would have been severed and pasted on the books as paid, as the ones falling due on these 250 bonds before had been so pasted. They were considered as absolutely of no value. The reason why he gave them to his wife we give in his own words:

" After I had subsequently made the contract with Sage, by which I was to sell him these $250,000 bonds, and I got out the bonds at the hotel, preparatory to delivering them, I discovered that the March, 1878, coupons, which were then about a month past due, were still attached to the bonds; and, under the impression that if the bonds had the appearance on their face of being defaulted bonds they might not sell so readily, I told Mrs. Turner if she would cut these coupons from the bonds she might have them; and I took the bonds, and she took the coupons; she got out her scissors, and cut them off."

For the same reason he had his wife later on cut off the 40 coupons on the bonds sold to Bingham. If at the time these coupons were cut off and given to Mrs. Turner they were considered by both husband and wife of no financial valuation, and this was in effect and intended as a cancellation of these coupons, following the practice as to the coupons which had matured before this while Turner and his friends owned the road, which were never paid or presented for payment, but pasted in the company's coupon book as canceled, there is a good and sufficient explanation of the fact that neither Mr. nor Mrs. Turner ever thought of or remembered anything about them for two years. But considering them of financial

79 MICH—10.

value, and that the detaching of them was not meant as a cancellation, and that they were given to Mrs. Turner as her property, and to be collected by her, there can be no good and sufficient explanation of this extreme forgetfulness.

When Mr. Vanderbilt acquired the 750 $1,000 bonds, and a majority of the stock of this road, he in fact owned and controlled it, and Turner testifies that after that he managed the road in Vanderbilt's interest, and under his direction; that Vanderbilt was then president of the Michigan Central, and the Chicago and Northeastern was purchased by him to prevent its being used as part of a through line in competition with the Central, and therefore business was discouraged, under Vanderbilt's direction, upon this road, as far as any through traffic was concerned, and the road earned nothing. When the coupons, in September, 1878, fell due, the road being sold to Vanderbilt March 30, 1878, the road could not pay them; and Vanderbilt, then being in the same position that Turner was before the sale, did not pay those upon the bonds held by him, because it would "be taking from the right hand pocket to put in the left." But the control of the road, if he meant to keep it, demanded that Vanderbilt should pay the coupons upon the bonds held by others; for, if the bonds were defaulted, a receiver might be appointed.

The 250 $1,000 bonds upon which Vanderbilt had a call were sold to Sage, April 4, 1878. T⸍ ˙ were in his hands when the September, 1878, coupons matured. He claimed payment upon these coupons, not from Turner, but from Vanderbilt, who was to all intents and purposes the Chicago & Northeastern Railroad Company. Vanderbilt at first declined to pay, and did not do so until some time in the spring of 1879.

It is claimed by the counsel for the defendants Turner that the fact that Vanderbilt paid these September, 1878,

coupons is conclusive that in his purchase of said bonds of Turner under the "call," receiving them from Russell Sage, to whom they were pledged or sold subject to such call, he did not buy or intend to buy all the past-due coupons belonging to said bonds, and consequently did not purchase or become the owner of the 250 coupons cut from these same bonds by Mrs. Turner in 1878. But Mr. Turner advised Vanderbilt to pay these coupons, because Sage might get a receiver appointed if they were not paid; and he testifies that after he sold the $750,000 bonds to Vanderbilt the bonds and coupons were a lien upon a road owned by William H. Vanderbilt, and that—

"The Chicago & Northeastern Railroad Company never paid a coupon in the world,—nobody ever paid a coupon, except what Mr. Vanderbilt paid to Sage; that was paid because Mr. Sage might move to have a receiver appointed."

Under these circumstances, it is not at all likely that Vanderbilt would have taken these $250,000 bonds of Sage, as he did in January, 1879, if he had known that the coupons for March, 1878, were outstanding and unpaid. If they were outstanding and collectible, they were a lien on Vanderbilt's property, and must be paid by him. In this purchase by Vanderbilt his aim was to get all the bonds of the road as well as its stock into his possession, and he evidently understood, as did Turner, that he was taking these bonds as they were, and that all the past-due coupons, except those of September, 1878, held by Sage, were either paid or canceled.

The proofs show that when the transfer was made to Hickson the bonds and coupons, a large number of them, were brought in wrapped in newspapers. Some of the coupons were detached and in envelopes. It was decided not to compare or count them, the agent of Hickson, Mr.

Wright, relying upon the assurance of Mr. Cornelius Van-
derbilt and Mr. Turner that all the bonds and coupons
covered by the purchase were there, and that there were
no unpaid coupons existing which were not there, or pasted
on the company book at Lansing, and canceled. After-
wards it was discovered that these 290 coupons were miss-
ing. What Turner supposed he had sold, and intended
to sell, to Vanderbilt is shown by his letters in answer to
inquiries concerning these missing coupons. Mr. Med-
daugh in November, 1879, telegraphed Mr. Turner that
301 of the March, 1879, coupons were missing, and asked
what he knew about them. Meddaugh meant to inquire
about the March, 1878, coupons, but the telegram, as
received by Turner, read, "March, 1879." Mr. Turner
replied by letter, dated November 24, 1879, among other
things as follows:

"I replied to your telegram of Saturday as to the
missing coupons. The company never paid any March,
1879, coupons, and consequently they should be with the
bonds you bought of Mr. Vanderbilt, as I understood
distinctly that for the price you paid you was to have
the bonds, all unpaid coupons, as they held them; and
for want of time each bond was not examined, but Mr.
Cornelius Vanderbilt assured you, in my presence, that
all the coupons were attached to the bonds, except the
ones we had canceled in the book. Mr. Pond can doubt-
less get for you any missing coupons. The stock ledger
in Mr. Percy's hands will answer your questions as to the
stock."

Mr. Meddaugh then wrote Mr. Turner, calling his
attention to the March, 1878, coupons as the missing
ones. Mr. Turner replied November 30, 1879, and below
is given so much of his letter as refers to these coupons:

"365 DEARBORN AVE., CHICAGO, ILL., Nov. 30, 1879.
"E. W. MEDDAUGH, ESQ.,
                "Detroit, Mich.
"*Dear Sir:* Your esteemed favor of 27th was for-

warded to me at this place, and I note what you say in reference to the 301 coupons which matured on the C. & N. E. bonds in March, 1878. I sold the bonds to Vanderbilt in January, 1878, with all the March, 1878, coupons attached. After his purchase the road never earned any interest, so that no coupons were ever paid after that, and consequently no coupons of March, 1878, ever came into the hands of the company for cancellation. The coupons were probably cut off from the bonds in question by Mr. V. for collection, and, not being paid, afterwards stored away with defaulted coupons. Mr. Pond can doubtless get them for you now, as you was certainly to have them in your purchase. I recollect of Mr. C. Vanderbilt saying to you on the·day you bought that all the coupons were with the bonds, except those in the hands of the company, canceled; and on the strength of this statement I recollect that you did not examine each particular bond."

It seems, therefore, conclusive that Turner, from his own letters, supposed that he had sold the bonds to Vanderbilt with the March, 1878, coupons attached, which he did as far as the 750 were concerned, and that he clearly intended, at any rate, that all the coupons on all the bonds sold should go to Vanderbilt, except those in the hands of the company, canceled. He also admits in his testimony that he so supposed up to the time in 1880 when his wife handed to him the missing coupons. Then it came back to his mind for the first time that he had given them to her. This being the intent of both Vanderbilt and Turner, that Vanderbilt should acquire by his purchase not only the bonds, but all coupons not canceled, and both parties supposing that all such coupons had been delivered with the bonds, and both so assuring Mr. Hickson at the time of his purchase, there is but one course in equity to pursue as between complainant and James M. Turner, and that is to make the contract and the delivery what it was intended and supposed to be.

As far as Mrs. Turner is concerned, it is sufficient to say that in no manner can she claim to be an innocent purchaser of these past-due coupons. She gave no consideration for them, and, as before said, placed no value upon them when she received them; and in equity and good conscience her husband had no moral or legal right to give them to her, to be enforced as her own, at the time it is claimed he did so.

It is not necessary to follow the case much further. After these missing coupons were discovered there was a want of frankness in the conduct of Mr. Turner, to say the least. He did not attempt to collect the coupons as his own, or as his wife's, directly from the complainant, but sent them to Russell Sage, asking Sage to demand payment upon them in Sage's name; as he writes, he thought—

"The moral effect of having the coupons turn up in your [Sage's] hands will bring speedy payment without suit, and you can very properly hold them as collateral to my two notes of $5,000 each."

When Sage presented them, and the complainant began to make inquiries of Vanderbilt, holding him responsible for them, Mr. Worcester, the agent of Vanderbilt, wrote to Mr. Turner for information in relation to these coupons. The reply of Mr. Turner was misleading, as was his subsequent correspondence and actions. He gives Mr. Worcester no information as to the ownership of these coupons, or how they came into the hands of Sage, but gives him positive assurance that Vanderbilt never had any bonds from him upon which there were outstanding coupons. The complainant finally refused to pay these coupons, on the ground that it purchased them of Vanderbilt, and Sage thereupon wrote to Turner that he (Turner) would have to look to Vanderbilt. No further efforts were made to collect these coupons, and no demand

of payment was made upon complainant, until the commencement of Mrs. Turner's suit, in 1885, and complainant had no hint that these coupons were in the hands of either of the Turners, until a month or so before the bringing of said suit. These proceedings of Turner, after the discovery of the coupons in his wife's possession, strengthen the position and claim of complainant that Turner intended to convey all past-due coupons, not canceled, to Vanderbilt, and, knowing that Vanderbilt understood that he had done so, he did not desire to, and never did, make a different claim to Vanderbilt. Vanderbilt died in 1885, soon after the bringing of suit by Mrs. Turner.

The 40 coupons must also be considered as paid. The testimony of Turner shows that Mr. Vanderbilt authorized him to buy more of the bonds, and in October, 1878, he went to Cleveland, Ohio, to buy $30,000 bonds held by the Cleveland Iron Company; that he had $20,000 bonds belonging to himself pledged at Cleveland, and he sold them to Mr. Bingham, who was acting for the Cleveland Iron Company, and then bought them back with the $30,000, making $50,000 in all, for Mr. Vanderbilt. Before he sold his $20,000 bonds to Bingham he had his wife cut off the March and September, 1877, coupons, which were past due, and gave them to her. When he did this, he did not remember having done the same thing on the $250,000 bonds, nor did his wife say anything about it. The bonds also had March, 1878, and September, 1878, coupons past due upon them. Turner does not know why he did not cut them off. These went with the bonds to Vanderbilt. Here it appears very plain, again, that this severing of the coupons was at the time meant as a cancellation, and that they were not detached with any idea of ever collecting them. If so, why were not all the past-due coupons cut off? The coupons on

the bonds—the $30,000 bought of the Cleveland Iron Company—probably corresponded, as to unpaid, coupons, with the $20,000 belonging to Turner after this clipping, as no coupons were ever paid by anybody, save those held by Sage, as heretofore stated. Mr. Turner, acting as the agent of Vanderbilt in this purchase, had no right to cut off and retain or give away these past-due coupons as live papers to be collected afterwards of Vanderbilt, who then owned the road. He was employed by Vanderbilt to purchase these bonds, and Vanderbilt was buying them to get them into his hands to save the payment of coupons. Turner did not let Vanderbilt know that he was selling some of his own bonds under the guise of this Bingham transaction. To cut off these past-due coupons, and retain them for future collection either for himself or his wife, would be a fraud upon Vanderbilt which the law would not permit, under the circumstances of Turner's employment and relations with Vanderbilt, when done without the consent or knowledge of the latter, and we do not think that Turner intended any such fraud at the time.

There is no legal impediment in the way of doing justice in this case. All of these 290 coupons belonged to Vanderbilt by right, which right the complainant has acquired. No rights of any innocent purchaser for value have intervened, and the complainant is entitled to the relief prayed in its bill. There is no question of any assignment of a claim of fraud from Vanderbilt to complainant. Therefore the authorities cited to sustain the doctrine that fraud is not a marketable commodity, and that a right to sue in equity for a fraud is not assignable (see *Brush v. Sweet*, 38 Mich. 574), do not apply to this case. The case here is simply this: These coupons sued upon by Mrs. Turner must be held to have been canceled, and in effect paid, when they were severed by Mrs. Turner's scissors, as they were so understood by

Turner and Vanderbilt; and, as before shown, Hickson acted upon the assumption and assurance of both Vanderbilt and Turner that all the coupons, except the canceled ones, were in Vanderbilt's possession from his purchase of Turner, and were being delivered in the packages and envelopes turned over by Vanderbilt to Hickson's agent in New York. The complainant now asks that this intent of the parties be carried out by the decree of this Court. We find no legal obstacle in the way of doing this.

The decree of the court below is reversed, and a decree will be entered here in conformity to the prayer of complainant's bill, with costs of both courts against the defendants Turner.

The other Justices concurred.