THOMAS WELLMAN v. THE CHICAGO & GRAND TRUNK RAILWAY COMPANY.

*Constitutional law—Railroad companies—Authority of Legislature to fix maximum rate of charges—Graded fare law of 1889.*

1. It is for the Legislature, and not for the courts, to determine what are *reasonable* maximum rates of charges for the transportation of passengers and freight on the different railroads of the State, under the power conferred by section one of Article 19a of the Constitution.

2. Act No. 202, Laws of 1889, which fixes a maximum charge for the transportation of passengers on the different railroads of the State, upon the basis of their gross earnings per mile, and which in so doing distinguishes between railroads located in the Upper Peninsula and those in the Lower Peninsula, is constitutional.

Error to St. Clair. (Canfield, J.) Argued January 24, 1890, and reheard June 13 and 25, 1890. Decided December 24, 1890.

Case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*E. W. Meddaugh* and *Otto Kirchner*, for appellant.

*W. L. Webber*, in behalf of the Flint & Pere Marquette Railroad Company.

*William T. Mitchell,* for plaintiff.

*John Atkinson,* for the people.

[The points of counsel and the authorities are so fully stated and reviewed in the opinions that their restatement from the briefs of counsel is omitted.—REPORTER.]

MORSE, J. By Act No. 202, 'Laws of 1889, section 3323 of Howell's Statutes, being a part of the general railroad law of this State, was amended. This amendment, for the purposes of this case, is given here in so far as it affects it. It is enacted that every railroad corporation shall possess the general powers, and be subject to the liabilities and restrictions, following, that is to say:

"*Ninth.* To regulate the time and manner in which passengers and property shall be transported, and the tolls and compensation to be paid therefor; but such compensation for transporting any passenger, and his or her ordinary baggage, not exceeding in weight 150 pounds, shall not exceed the following prices, viz.: For a distance not exceeding five miles, three cents per mile; for all other distances, for all companies the gross earnings of whose passenger trains, as reported to the Commissioner of Railroads for the year one thousand eight hundred and eighty-eight, equaled or exceeded the sum of $3,000 for each mile of road operated by said company, two cents per mile; and for all companies the earnings of whose passenger trains reported as aforesaid were over $2,000 and less than $3,000 per mile of road operated by said company, two and a half cents per mile; and for all companies whose earnings, reported as aforesaid, were less than $2,000 per mile of road operated by said company, three cents per mile: *Provided,* That in future, whenever the earnings of any company doing business in this State, as reported to the Commissioner of Railroads at the close of any year, shall increase so as to equal or exceed the sum of $2,000 or $3,000 per mile of road operated by said company, then, in such case, said companies shall thereafter, upon the notification of the

83 MICH.—38.

Commissioner of Railroads, be required to only receive as compensation for the transportation of any passenger, and his or her ordinary baggage not exceeding in weight 150 pounds, a rate of two cents and a half or two cents per mile, as hereinbefore provided: *Provided,* That roads in the Upper Peninsula which report, as above provided, passenger earnings exceeding $3,000 per mile, shall not charge to exceed three cents per mile, and roads reporting less than $3,000 per mile shall be allowed to charge not to exceed four cents per mile."

The gross earnings of the defendant corporation, as shown by the report of said corporation to the Railroad Commissioner for 1888, exceeded the sum of $3,000 per mile. The law took effect October 2, 1889. On that day, the plaintiff applied at the office or station of the defendant at Port Huron for a ticket of passage from Port Huron to Battle Creek, a distance of 159¾ miles, and tendered therefor the sum of $3.20 in legal tender money of the United States. The money was refused, and the agent of the defendant company refused a ticket to plaintiff for such sum, which refusal the plaintiff avers was of damage to him, and brings suit. The suit was commenced in the circuit court for the county of St. Clair, and the plaintiff recovered judgment. The circuit judge charged the jury as follows:

"I charge you, gentlemen, that, by Act No. 202 of the Public Acts of this State of 1889, all railroad corporations, owning or operating railroads in this State, the gross earnings of whose passenger trains, as reported to the Commissioner of Railroads for the year 1888, equaled or exceeded the sum of $3,000 for each mile of road operated by said company, were required to transport passengers at the rate of two cents per mile. It is admitted that the defendant's earnings per mile, as reported to the Commissioner, exceeded that sum. It is claimed by the defendant that this law is unconstitutional and void, but I charge you the law is valid, and that under that law the defendant was bound to transport the plaintiff at the rate of two cents per mile, and for its

refusal so to do the plaintiff may recover; and it is for you to assess his damages at such sum as you think him entitled to under all the circumstances, and such as will compensate him for the injury he is shown to have sustained."

It being evident from the record that this was a friendly suit between the plaintiff and the defendant to test the constitutionality of this legislation, the Attorney General, when it was brought into this Court upon writ of error, very properly interposed, and secured counsel to represent the public interest. In the stipulation of facts, or in the taking of testimony in the court below, neither the Attorney General nor any other person interested for, or employed in the behalf of, the people of the State took any part. What difference there might have been in the record, had the people been represented in the court below, however, under our views of the case, is not of material inquiry.

We are not informed what questions were raised in the court below, except that the constitutionality of the statute was attacked. In this Court it is urged that the Legislature has no power to prescribe absolutely a maximum rate for passenger fares; that a railroad corporation is a common carrier, and the Legislature has no right to fix arbitrarily the limit of its charges. It is admitted that the franchise and privilege conferred by the State upon these corporations to build, own, maintain, and operate a railroad, and the power also conferred to exercise the right of eminent domain in securing the right of way for the road, and the right of locating the road-bed and tracks along and across public highways and other thoroughfares, clothe such railroad property with a semi-public character, and subject it to the control of the State, in regard to the compensation for its use, to the extent that its charges must be reasonable, and that the Legislature has the right, as to such

property, to pass such reasonable rules and regulations as will accomplish that result. But it is insisted that in its ownership it is private property, and the granting of these privileges does not take from the company its right, as owner, to make and fix its own tariff of charges, but only requires, for the protection of the public, that such tariff shall be reasonable. Within the bounds of reasonableness, the owner has full power and right to make such tariff.

Leaving out of view for the present the decisions of the Supreme Court of the United States upon this question, which will be considered hereafter (as this must be conceded to be in some of its phases a federal question, and controlled by such decisions, if applicable), we will examine our own Constitution, policy, and laws as regards this subject. This is the first time, we think, that the right of the State to control and fix the maximum rates of freight or passenger fares has been denied in Michigan. The statute amended by the act under consideration provided that—

"The compensation for transporting any passenger, and his or her ordinary baggage not exceeding in weight *100* pounds, shall not, except on railroads operating less than 20 miles of road, exceed the following prices, viz.: For a distance not exceeding five miles, *four* cents per mile; for all other distances, not exceeding *three* cents per mile; and no fare shall be less than five cents, and that amount, in any case, may be charged and collected : * * * *Provided*, That, in the Upper Peninsula, *five* cents per mile may be charged and collected on all railroads." How. Stat. subd. 9, § 3223, p. 841.

The first general railroad law of the State provided that—

"The compensation for any passenger, and his ordinary baggage, shall not exceed three cents a mile, unless by special act of the Legislature, and shall be subject to alteration as hereinafter provided." Act No. 82, Laws of 1855, subd. 9, § 17, p. 160; 1 Comp. Laws 1857, p. 638.

In 1869, the Legislature amended this subdivision so that the compensation on roads over 25 miles in length should not exceed three cents per mile ; not over 25 miles in length, four cents. Act No. 109, Laws of 1869, p. 182; 1 Comp. Laws 1871, p. 752.

In 1873, after the adoption of the constitutional amendment (article 19a) there was a general revision of the railroad laws. In that revision the rate was fixed as found in Howell's Statutes. See Act No. 198, Laws of 1873, p. 506. Section 11 of article 5 of this revision provided that this act might at any time be altered, amended, or repealed, but such alteration, amendment, or repeal should not affect the rights of property of companies organized under it. Laws of 1873, p. 542 ; How. Stat. § 3395. It will thus be seen that the right of the Legislature to fix the maximum rate for passenger fares has been exercised ever since the first general enactment as to railroads, in 1855. The defendant corporation holds its franchise, and enjoys its privilege to do business in this State, under this general railroad law, and for many years has acquiesced in the statute fixing the maximum rate of its passenger fares ; nor has it, or any other road in the Lower Peninsula, complained of the distinction made in such law between such roads and the roads in the Upper Peninsula. And in 1870 the people of the State amended the organic law, the Constitution of the State, expressly conferring upon the Legislature the power to fix such maximum rates:

"The Legislature may, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on different railroads in this State, and shall prohibit running contracts between such railroad companies, whereby discrimination is made in favor of either of such companies as against other companies owning connecting or intersecting lines of railroad." Article 19a, § 1.

This constitutional provision, beyond all doubt, authorizes the Legislature to fix maximum rates with only one limitation, to wit, that such maximum rate shall be a reasonable one; and, in my opinion, the use of the word "different" authorizes the Legislature not only in such legislation to classify the railroads, but to legislate differently for *different* railroads. The argument, therefore, presented by the Honorable William L. Webber, that the legislation under consideration is class legislation, and therefore unconstitutional, has no weight as against this express clause of the Constitution, as I construe it. It must have been the intention of the Legislature in submitting this article, as well as of the people in adopting it, to authorize any reasonable classification of railroads in this State for the purposes of fixing such rates. Not only is this the natural and logical interpretation of the meaning of the word "different," as used in said section 1 of the article, but, as shown by Mr. Webber in his argument, there can be no possible legislation on this subject which will not, if general and treating all railroads the same, operate unequally, and therefore be open to the charge that it benefits one class of railroads at the expense of other classes, and consequently will in effect be class legislation. His argument is, by way of illustration, that, if the Michigan Central trains should be limited to the charge of two cents per mile from Jackson to Mackinaw and from Saginaw to Detroit, it would, of necessity, compel the Grand Rapids & Indiana Railroad also to carry at two cents a mile from Mackinaw south, and the Flint & Pere Marquette Railway to carry at the same rate from Saginaw to Detroit, because of the competition between the roads running in the same direction, and to the same places, and says: "This is class legislation of the worst character." Or, he says:

"Take a more striking illustration. Why should the

Michigan Central Railroad Company be limited to two cents a mile [its gross earnings being over $3,000 to the mile], the Detroit, Grand Haven & Milwaukee be limited to $2\frac{1}{2}$ cents per mile, and the Detroit, Lansing & Northern be permitted to charge 3 cents per mile between Grand Rapids and Detroit?"

It is made apparent by his own argument that the general law, existing before the amendment of 1889, fixing the maximum rate on all roads in the Lower Peninsula, without classifying them, was also subject to the objection that he makes against the present law as class legislation, because it operated unequally; for, if fixing the rate at two cents upon one class of roads would force, as claimed by Mr. Webber, competing roads whose gross earnings did not reach $3,000 per mile, of necessity, also to reduce their rates to two cents, thus operating unequally, and being legislation benefiting one class more than another, or hurting one class more than another, and therefore, as he deduces, class legislation, then a *three-cent* rate applied to all the railroads is open to the same objection, for, if it is unfair and unequal to force all the railroads to a two-cent rate, because some can better afford so to limit their charges than others, then it is unfair and unequal, for the same reason, to force a general limit of three or any other number of cents per mile. And this inequality and injustice exists just the same under a general law as it does when forced by the necessities of competition. It fact, Mr. Webber's whole argument makes it clear that no general law can be passed fixing the maximum rates on all roads alike, without reference to cost of construction or service, the amount of their business or income, and their indebtedness, which will not give some roads undue advantage over others. See, also, *Railroad Co. v. Iowa*, 94 U. S., at page 164. Therefore, it seems to me, the Legislature

in submitting, and the people in adopting, this amend-
ment, knowing that all general legislation in this regard
must, in its consequences, operate in a certain sense as
class legislation, wisely used the word "different" to
signify, as it naturally does, that the Legislature in this
matter was granted power to make distinctions in legis-
lation between the different railroads of this State, if
such distinctions are reasonably made.

And the distinction between the roads of the Upper
and the Lower Peninsula must be considered, in the
absence of any showing to the contrary, to be a reason-
able one. We are authorized to take judicial knowledge,
for it is a matter of general knowledge, that the cost of
building and running railroads in the Upper Peninsula
is much greater than that in the lower, owing to the
marked physical difference between them in the character
and face of the country. This distinction has been
carried in the railroad law of the State for over 17 years;
and distinctions in the legislation, upon many matters,
between the two peninsulas have been constant and fre-
quent ever since the Upper Peninsula has been a part of
Michigan. And the Constitution of 1850 provides differ-
ently for the two sections of the State in regard to what
the Legislature may do as to the pay of its members
from the Upper Peninsula. Article 4, § 15. It provides
also for a different disposition of the specific taxes from
mining companies in the Upper Peninsula from other
specific State taxes. Article 14, § 1; Article 19, § 7.
This portion of the State is also treated by itself in
article 19, and provisions there made as to its courts and
other matters. It is true that Article 15, § 1, of the
Constitution of 1850, prohibits the formation of any
corporation in this State, except for municipal purposes,
by any other than general laws. And this provision of

the Constitution was no doubt righfully interpreted by this Court in *Nelson v. McArthur*, 38 Mich. 207, where it is said that—

"The great purpose of the provision was to introduce a system of legislation in regard to the institution of corporations, which would exclude the corruption and party favoritism which had too often accompanied · the method previously in vogue, and to secure as far as practicable for all the people of the State an equality of opportunity, and a guard against sectional discriminations."

But the amendment known as section 1 of article 19*a* was adopted in 1870, and must be considered as qualifying and modifying the letter, as well as the spirit, of Article 15, § 1, as regards legislation fixing the maximum of freight and passenger rates. It therefore follows, in my view of section 1, Art. 19*a*, of the Constitution, that the Legislature had not only the power to make the distinction it did as to the two peninsulas of our State, but to classify the different railroads upon the basis of their gross earnings.

But in regard to the latter classification, we are not without light from our own and other courts. In the first place, all roads earning the same amount per mile are treated alike, and there is therefore no distinction between them, if the gross earnings of the railroad furnishes a proper and reasonable basis for legislation of this character. Mr. Meddaugh, of counsel for the defendant, in his brief makes no complaint against the right of the Legislature to make this classification, if they have the right to legislate at all upon the subject; and, in arguing against the constitutionality of the distinction between roads in the Upper and Lower Peninsula, he says in his brief:

"There is no excuse for confusing in the mind the power of the State to classify all railroads for passenger

and freight rate purposes, with reference to their earnings, with that of making a territorial division of the roads for the same purpose, for the two are essentially dissimilar in character. By the former, all roads similarly circumstanced in respect of earnings are treated alike, while by the latter they may be, as here, treated very unlike. It is this distinction that lies at the very foundation, and constitutes the reason, of the constitutional provision and the constitutional principle I am urging against this act."

Mr. Kirchner, also of counsel for the defendant, argues that the act is not reasonable because based upon the *gross* earnings, regardless of its operating expenses, when the operating expenses, although they did not do so in 1888, may in the future years exceed the gross receipts. Mr. Webber, not of counsel, but who, on his request, was permitted to file a brief in the case, objects to the classification of roads in reference to their gross earnings, on the ground that there are no reasonable maximum rates contemplated in this classification. It does not purport to be based upon the theory that railroad companies have earned more than reasonable compensation. Such a classification is purely arbitrary, he claims.

"It has no relation to the cost of the service; it is immaterial whether the road cost $20,000 per mile or $40,000 per mile; it is immaterial whether the terminal facilities have cost millions of dollars to the railroad companies, or hundreds only. These questions are all ignored. And without reference to whether the income of the past has been such as to enable the company to pay its interest, or whether the balance is on the wrong side of the ledger, it fixes the limitation purely with reference to the gross income from passenger trains, without reference to cost of service."

It seems to me that a classification according to gross earnings is the fairest and most reasonable method of classification.

Why should a corporation which is more economical

than another in the matter of expenses be at a disadvantage in the law over one that is extravagant? And why should a corporation out of debt be adjudged entitled to charge less for its services than one heavily in debt? As was well said on the argument, it would be a strange ordinance of a city that would regulate the amount of fare to be charged by a hackman by the cost of his team and carriage, and take into consideration the debts he owed, and the interest that he was paying. And yet, if railroads are to be regulated or controlled in the matter of fares by the Legislature, upon what principle must they be classified in accordance with their net earnings, and their indebtedness taken into consideration, which does not govern also the imposition of rates upon hackmen? One is a common carrier as well as the other. Both may be said to have privileges granted them by the government which authorize a reasonable regulation of their charges; but the privileges of a hackman sink into insignificance when compared with the franchise and privileges granted to railroad corporations. And yet no one has ever contended that a hackman could interpose the cost of his team and carriage, or his indebtedness upon them, against the reasonableness of the restriction of his charges. A classification according to the amount of business done per mile seems to me to be the fairest and the most reasonable classification, if railroads are to be classed at all, in the fixing of the maximum rates; and this method of classification is not unusual, and has been sustained in a variety of cases. A law classifying railroads for taxing purposes according to their income was held constitutional in *Railroad Co. v. Gibbes*, 27 S. C. 385 (4 S. E. Rep. 49). A law classifying business for taxing purposes is constitutional. *Manufacturing Co. v. Wright*, 33 Fed. Rep. 121. A law classifying insurance companies for taxation according to the premiums received

was held valid in *State v. Insurance Co.*, 40 La. Ann. 463
(4 South. Rep. 504). In *Walcott v. People*, 17 Mich. 68,
it was held that the Legislature had the power to tax the
business of an individual engaged in carrying express
according to the gross earnings of the business. Mr.
Justice CAMPBELL dissented, upon the ground that sec-
tions 11 and 12 of the article of the Constitution on
finance and taxation declare that "the Legislature shall
provide a uniform rule of taxation, except on property
paying specific taxes;" and that "all assessments here-
after authorized shall be on property at its cash value;"
and that, the Constitution pointing out the cases in
which specific taxes might be levied, which did not
include the case in hand, such taxation was therefore
forbidden by the Constitution in the case then at bar.
There is, however, no intimation in such *dissenting*
opinion that such a listing for taxation was unjust or
unreasonable. In *Youngblood v. Sexton*, 32 Mich. 414,
involving the constitutionality of the liquor law of 1875,
the validity of the tax was assailed on the ground that
it was not levied on any principle of equality or uniform-
ity, and therefore was wanting in one of the essential
elements of taxation under our Constitution. Mr.
Justice COOLEY, in disposing of this point, said:

"If the precise point here is that the tax is unequal
and unjust because it is not levied in proportion to the
business done, then the objection is without force. It
may possibly be true that an apportionment according to
the business done would have been more just, but a
question of this nature concerns the Legislature, and not
us. Courts cannot annul tax laws because of their operat-
ing unequally and unjustly. If they could, they might
defeat all taxation whatsoever; for there never yet was a
law that was not more or less unequal and unjust in its
practical workings."

The same may be said here. There can be no classifi-
cation of railroads for the purpose of fixing maximum

rates for carriage that will not operate more or less unequally upon different railroads, and be unjust to some of them so classified. To argue that the Legislature cannot make any classification which operates unequally is to argue that the Legislature can make no classification at all. And if no classification can be made, and the maximum rate must be fixed the same for all, then the law is admitted to operate unequally and unjustly, because some companies are to less expense than others in the same length of road by reason of the nature of the country through which they run; some have costly terminal facilities, and some have not; some owe large amounts, and some do not; and some do a large amount of business, and some do not. The matter, then, resolves itself to this, which is in fact the main argument, to which all these collateral lines of discussion by the defendant's counsel run and connect: That the Legislature has absolutely no power to interfere with or regulate the fixing of tolls by the railroad companies of this State. This view of the case, however, cannot be considered in the light of our Constitution, as heretofore shown. The legislature of Iowa, in 1874, enacted as follows:

"All railroads in this State shall be classified according to the gross amount of their respective annual earnings within the state per mile for the preceding year, as follows: Class A shall include all railroads whose gross annual earnings per mile shall be $4,000 or more. Class B shall include all railroads whose gross annual earnings per mile shall be $3,000, or any sum in excess thereof less than $4,000. Class C shall include all railroads whose gross annual earnings per mile shall be less than $3,000."

The statute also provided that railroads in class A should charge not to exceed 3 cents per mile; class B, not to exceed 3½ cents per mile; and class C, not to exceed

4 cents per mile. The constitution of Iowa provides, what ours does not, that "all laws of a general nature shall have a uniform operation." The case went to the Supreme Court of the United States, and is found in 94 U. S. 155. (*Railroad Co. v. Iowa.*) It was held, in spite of this constitutional provision, and also of another, to wit:

"The general assembly shall not grant to any citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens,"—

That this legislation was valid. The Court said :

"The statute divides the railroads of the state into classes, according to business, and establishes a maximum of rates for each of the classes. It operates uniformly on each class, and this is all the constitution requires."

This latter clause of the Iowa constitution is not found in ours ; neither did the constitution of that state directly authorize the passage of laws fixing maximum rates, as does ours, in article 19*a*.

The statutes of Arkansas fixed the passenger rates on lines of railroad 15 miles or less in length, eight cents per mile; 15, and less than 75, in length, five cents; and on lines over 75 miles in length, three cents. In *Dow v. Beidelman,* 125 U. S. 680 (8 Sup. Ct. Rep. 1028), the Supreme Court of the United States upheld this legislation, and said :

"The legislature, in the exercise of its power of regulating fares and freights, may classify the railroads according to the amount of the business which they have done, or appear likely to do. Whether the classification shall be according to the amount of passengers and freight carried, or of gross or net earnings, during a previous year, or according to the simpler and more constant test of the length of the line of the railroad, is a matter within the direction of the legislature. If the same rule is applied to all railroads of the same class, there

is no violation of the constitutional provision securing to all the equal protection of the laws."

The Iowa case was cited and approved. It was shown in *Dow v. Beidelman* that the cost of construction of the railroad was $4,000,000, and that the company's indebtedness, bonded, was $2,850,000. The net income for 1886 was $162,000, earned principally from passenger traffic at five cents per mile. The law under consideration would reduce such net income to $58,000.

But it is contended that the reasonableness of such a classification was not raised before or determined by the Supreme Court of the United States in any of these cases, but simply the power of the legislature under the different state constitutions to do so. But, if this is so, we are then left to interpret our own Constitution and the Federal Constitution without the light of that Court upon the subject. As has been already said, I think the classification adopted a fair and reasonable one, nor does it appear to me to conflict, if reasonable, with the provision of the State and National Constitutions, that no person "shall be deprived of property without due process of law." But in *Dow v. Beidelman, supra,* it was claimed that the legislation there under consideration would reduce the net income so that the company would be able to pay less than 1½ per cent. on the cost of its road, without paying any interest on the bonded debt. If it was applied on the interest of such debt, which was bearing interest at 8 per cent., it could only pay a little over 2 per cent. upon such debt. This seems to have raised the question of reasonableness. But the Court said, and the opinion was not dissented from by any member of the Court:

"The plaintiffs in error do not contend that it is always or generally unreasonable to restrict the rate for carrying each passenger to three cents a mile. They

argue that it is so in this case by reason of the admitted fact that, with the same traffic that their road has now, and charging for transportation at the rate of three cents per mile, the net yearly income will pay less than one and a half per cent. on the original cost of the road, and only a little more than two per cent. on the amount of its bonded debt. But there is no evidence whatever as to how much money the bonds cost, or as to the amount of the capital stock of the corporation as reorganized, or as to the sum paid for the road by that corporation, or its trustees. It certainly cannot be presumed that the price paid at the sale, under the decree of foreclosure, equaled the original cost of the road, or the amount of outstanding bonded debt. Without any proof of the sum invested by the reorganized corporation, or its trustees, the Court has no means, if it would under any circumstances have the power, of determining that the rate of three cents a mile, fixed by the legislature, is unreasonable. *Still less does it appear that there has been any such confiscation as amounts to a taking of property without due process of law.*" 125 U. S. 690, 691.

The conclusion, then, is that the Legislature has the power, under the constitutional provision contained in article 19a, and also independently of it, as shown by the cases cited, to classify the railroads of this State, as it has, according to the amount of business done, and also as to their location in the Upper and the Lower Peninsula.

Another contention is that this legislation is invalid because it violates the contract which was entered into between the State and this railroad corporation when it organized under the general laws of this State. Mr. Meddaugh, in his brief, says:

"Railroad corporations organized under general laws of Michigan take their being under an implied contract that the State shall not reduce their tariff of passenger and freight rates, either in the exercise of its common-law powers or the constitutionally reserved power to repeal, alter, or amend, so as to deprive these corporations of the ability to earn a reasonable profit on the capital

invested. And the act in question clearly violates this principle."

The defendant corporation, as appears by its own bill of complaint filed in this Court in *Chicago & Grand Trunk Ry. Co. v. Turner*, 79 Mich. 133, was incorporated under our laws by the consolidation of different railroads. This consolidation and incorporation took place after the adoption of article 19*a*, to wit, as shown by its report to the Railroad Commissioner, April 1, 1880. The companies thus consolidated were five, three of whom had lines within this State, to wit: Michigan Railway Company, of Michigan, running from Michigan and Indiana state line to Lansing, Mich., incorporated January 7, 1880; Chicago & North Eastern Railroad Company, running from Lansing to Flint, incorporated August 12, 1874; Northwestern Grand Trunk Railway Company of Michigan, running from Flint to Port Huron, incorporated August 26, 1879. Each one of these, it will be seen, was also incorporated after the constitutional enactment, and also subsequent to the general revision of 1873. It is claimed by Mr. Webber, in his brief, that the proper construction of the phraseology of the statute under consideration does not—

"Subdivide the railroads of Michigan in accordance with the original charters under which the roads were constructed. It applies to railroad companies operating passenger trains; it does not apply to railroad companies not operating passenger trains. To illustrate: The Grand River Division of the Michigan Central Railroad was built, under a special charter, as the 'Grand River Valley Railroad Company;' yet the Grand River Valley Railrand Company operates no passenger trains, and makes no report of passenger earnings. The road is operated by the Michigan Central Railroad Company, and the Michigan Central Railroad Company reports the passenger earnings for this road; and it is the Michigan Central Railroad Company, as to the mileage of this division, which is the company 'whose passenger trains,

83 MICH—39.

reported as aforesaid,' earn the money. Every railroad in the State having now any considerable mileage is made by a union of companies,—that is, different portions of the road were constructed under separate and different charters,—but the ownership of the passenger trains, and the practical ownership and control of the railroad, is vested in the company which operates it; and this law under consideration, when . it says. 'All companies the gross earnings of whose passenger trains, as reported to the Commissioner of Railroads,' must have reference to the companies operating the railroads, and it cannot be held to apply separately to each particular corporation, whether general or special, by authority of which the road was originally constructed."

I think this construction is the correct one. Consequently this defendant, the Chicago & Grand Trunk Railway Company, must stand upon its own incorporation in this State. The law is aimed at it, and not at the separate corporations which it has absorbed, and which no longer exist, as far as this statute is concerned. Therefore, when it came under the provisions of our laws, and accepted the privilege of doing business in this State, it came in under a Constitution expressly authorizing the Legislature to alter the rates, with only the limitation that all legislation in such direction should be reasonable. This ends the question as to the violation of any contract, implied or otherwise. The Constitution prevails; and, as long as such provision remains therein, I deny the right of one Legislature expressly or impliedly to contract away the right of the people, through another Legislature, to enforce this provision of the Constitution by such legislation as to them may seem proper, provided it is reasonable. This view renders it unnecessary to discuss what might have been the rights of the defendant had it been organized, and operating passenger trains in this State, before the adoption of this. article of the Constitution.

The right of the Legislature to fix the maximum charges of rates upon railroads, if such rates are reasonable, under the Federal Constitution, has been frequently sustained by the United States Supreme Court. *Munn v. Illinois,* 94 U. S. 113; *Railroad Co. v. Iowa,* Id. 155; *Peik v. Railway Co.,* Id. 164; *Railroad Co. v. Ackley,* Id. 179; *Ruggles v. Illinois,* 108 Id. 526 (2 Sup. Ct. Rep. 832); *Stone v. Trust Co.,* 116 Id. 307 (6 Sup. Ct. Rep. 334); *Dow v. Beidelman,* 125 Id. 680 (8 Sup. Ct. Rep. 1028); *Banking Co. v. Smith,* 128 Id. 174 (9 Sup. Ct. Rep. 47); *Railway Co. v. Minnesota,* 134 Id. 418 (10 Sup. Ct. Rep. 462). I shall not attempt to analyze these decisions separately. This has been well done by the briefs on both sides. It is probably true that there have been some fluctuations in the opinions in the different cases, but the power of the legislature *reasonably* to regulate and control railroads as to their carrying rates has not been denied in any of them, and has, in my opinion, been lately affirmed in the case of *Railway Co. v. Minnesota, supra,* (decided March 24, 1890). The majority opinion in the case of *Munn v. Illinois,* the first of the series, holds that the reasonableness of such legislation is a question for the legislature to decide, and not for the courts. At page 133, 94 U. S., the Chief Justice says:

" It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a *judicial,* and not a legislative, question. As has already been shown, the practice has been otherwise. In countries where the common law prevails, it has been customary from time immemorial for the legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps more properly speaking, to fix a maximum, beyond which any charge made would be unreasonable. Undoubtedly in mere private contracts, relating to matters in which the public has no interest, what is reasonable must be ascertained judicially. But this is because the legislature has

no control over such a contract. So, too, in matters which do affect the public interest, and as to which legislative control may be exercised, if there are no statutory regulations upon the subject, the courts must determine what is reasonable. The controlling fact is the power to regulate at all. If that exists, the right to establish the maximum of charge as one of the means of regulation is implied. In fact, the common-law rule, which requires the charge to be reasonable, is itself a regulation as to price. Without it the owner could make his rates at will, and compel the public to yield to his terms, or forego the use. But a mere common-law regulation of trade or business may be changed by statute. A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. To limit the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one."

Justice Field, now on the bench, dissented. This same doctrine seems to have been affirmed in the Iowa case, 94 U. S. 155, and the Peik case, Id. 164.

There is nothing in any of the other cases in conflict with the idea that the reasonableness of the legislative enactment was to be determined by the legislature, until we reach the case of *Stone v. Trust Co.*, reported in 116 U. S. 307. The state of Mississippi, in 1884, passed an act to provide for the regulation of freight and passenger rates, and created a commission to supervise and fix the same, instead of doing it directly. The commission was authorized to revise the tariffs of the companies, but

with a view to "the character and nature of the services to be performed," and so as to "allow a fair and just return on the value of such railroad." It will be seen that this act made the value of the road a material factor in determining the rates by the commission. The commission was empowered to receive complaints, cite companies to answer, listen to evidence and arguments, and determine the rates to be charged. By the statute the determination of the commission was to be received by all courts as *prima facie* evidence that such determination was right and proper. See 116 U. S. 312. In the opinion of the Court, Chief Justice Waite cites *Munn v. Illinois*, 94 U. S. 113, and the Iowa case, Id. 155, and says that it was decided in those cases—

"That, as to natural persons and corporations subject to legislative control, the state could, in cases like this, fix a maximum, beyond which any charge would be unreasonable, and that such maximum, when fixed, would be binding on the courts in their adjudications, as well as on the parties in their dealings." See 116 U. S. 330.

But the Court, in still further speaking on the subject, said:

"This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which, in law, amounts to a taking of private property for public use without just compensation, or without due process of law."

This is made the text for the decision in the Minnesota case of March 24, 1890, and it is contended by the counsel for the defendant that this last case, reported in 134 U. S. 418 (10 Sup. Ct. Rep. 462), has virtually overruled all the preceding ones, and practically taken away from the legislature, not only the power to determine the reasonableness of the maximum rate it fixes, but the author-

ity to fix any such rate at all. There is certainly nothing in the decision denying the authority of the legislature to establish maximum rates. We have been presented with the brief of John W. Cary, Esq., of Milwaukee, counsel for the railroad company, filed in the case, in which he takes strong ground, denying that the legislature of Minnesota is authorized to fix by positive law the rates and charges for the transportation of persons and property over lines of railway owned by the defendant company, and holds that, under the Constitution of the United States, it is the right of the company to make, fix, and establish its rates and charges over its railway, subject only to the provision that such rates and charges shall be fair, just, and reasonable. He admits the right of the legislature to fix rates which may govern railroads organized after such legislation, but denies the right of such body to fix the compensation of existing railroads, or other like property, and claims that prior to the legislation in Illinois in 1873, and in Iowa, Wisconsin, and Minnesota in 1874, there was no authority for the exercise of such legislation anywhere, either in English or American jurisprudence or legislation. He attacks the case of *Munn v. Illinois*, and all the cases following it, as unsound and unjust, and insists that the first-named case is not sustained by the authorities cited by Chief Justice Waite to support it. He further says: "We deny that it is a legislative function to adjudicate and determine what are reasonable rates." The question as to whether a given rate is reasonable and fair, when challenged, is for the judiciary. Hence, contending that it is the exclusive right of the railroad companies to fix their rates, limited only by the condition that they shall be fair and just, and, when challenged, it being a question for the courts alone to determine, he deduces that the legislature has no right to fix or establish a maximum rate at all. And

the Court is distinctly asked to reverse and overrule its previous decisions to the contrary. But it did not do so. It would, indeed, have been a singular action, upon the part of the Court of very last resort in this country, to have overruled a long line of decisions upon a matter conceded to be of the highest importance to the whole people, by implication, and without alluding to the previous opinions of the Court, especially when such reversal was expressly demanded in the argument of the case.

But, in my opinion, we are not left in the dark by this latest decision upon this question. Mr. Justice Blatchford, in speaking for the Court, in answer to the argument that a contract existed that the company should have the power of regulating its rates of toll by its charter; and that any legislation by the state infringing upon that right impairs the obligation of that contract; and that there was no provision in the charter, or in the general statute, reserving to the state or territory the right to alter or amend the charter; and that no subsequent legislation of the territory or state could deprive the directors of the company of the power to fix its tolls, subject only to the general provision of law that such rates should be reasonable,—says:

"But we are of opinion that the general language of the ninth section of the charter * * * cannot be held to constitute an irrepealable contract with that company that it should have the right, for all future time, to prescribe its rates of toll, free from all control by the legislature of the state. It was held by this Court in *Railroad Co. v. Miller*, 132 U. S. 75 (10 Sup. Ct. Rep. 34), in accordance with a long course of decisions both in the state courts and in this Court, that a railroad corporation takes its charter, containing a kindred provision with that in question, subject to the general law of the state, and to such changes as may be made in such general law, *and subject to future constitu-*

*tional provisions* and future general legislation, in the absence of any prior contract with it exempting it from liability to such future general legislation in respect of the subject-matter involved; and that exemption from future general legislation, either by a constitutional provision or by an act of the legislature, cannot be admitted to exist unless it is given expressly, or unless it follows by an implication equally clear with express words. * * * In *Stone v. Trust Co.*, 116 U. S. 307, 325, the whole subject is fully considered, the authorities are cited, and the conclusion is arrived at that the right of a state *reasonably* to limit the amount of charges by a railroad company for the transportation of persons and property within its jurisdiction cannot be granted away by its legislature, unless by words of positive grant, or words equivalent in law; and that a statute which grants to a railroad company the right, 'from time to time, to fix, regulate, and receive the tolls and charges by them to be received for transportation' does not deprive the state of its power within the limits of its general authority, as controlled by the Constitution of the United States, to act upon the reasonableness of the tolls and charges so fixed and regulated. But, after reaching this conclusion, the Court said (page 331).

"'From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward. Neither can it do that which, in law, amounts to a taking of private property for public use without just compensation, or without due process of law.' There being, therefore, no contract or chartered right in the railroad company which can prevent the legislature from regulating in some form the charges of the company for transportation, the question is whether the form adopted in the present case is valid." 134 U. S. 454.

The case was presented to the courts in this way: The legislature of Minnesota created a railroad and warehouse commission, consisting of three persons, appointed by the governor and confirmed by the senate. The

statute in relation to this commission, and regulating common carriers, provides that—

"All charges made by any common carrier  *  *  * for any service rendered, or to be rendered, in the transportation of passengers or property,  *  *  *  shall be equal and reasonable, and every unequal ' and unreasonable charge for such service is prohibited and declared to be unlawful."

If the commission find at any time that any of such charges are unequal or unreasonable, it is granted power, and is authorized and directed, to compel any common carrier to change the same, and adopt such charge as the commission "shall declare to be equal and reasonable." Upon complaint that certain charges of the defendant company for conveying milk were unequal and unreasonable, the commission proceeded to investigate, and found that such charges were unequal and unreasonable, and declared that a rate of $2\frac{1}{2}$ cents per gallon in 10-gallon cans was an equal and reasonable rate for such service. The company was charging and receiving 3 cents per gallon for the transportation. The commission thereupon directed the defendant company to carry the milk for $2\frac{1}{2}$ cents per gallon. The company refused to comply with this direction. The commission, through the attorney general, then made application to the supreme court of Minnesota for a writ of *mandamus* to compel the company to obey the direction. The company returned to the alternative writ, which was issued by the court, certain constitutional objections, and also that the rate of 3 cents per gallon was a reasonable, fair, and just rate; and that the rate fixed by the commission was not a reasonable, fair, or just compensation to the company for the service rendered; and that the establishing of such rate by the commission, against the will of the company, was, *pro tanto,* a taking of its property without due process of law.

Upon the hearing, the court refused to take testimony on the issue as to whether the rate fixed by the commission was reasonable, fair, and just, and issued a peremptory writ. The Minnesota supreme court held that the intention of the legislature was not that the rates fixed by the commission should be merely *prima facie* equal and reasonable, but *final* and *conclusive* as to what are lawful or equal and reasonable charges. The court held that there was therefore no fact to traverse, except the violation of the law in refusing compliance with the recommendations of the commission. 38 Minn. 281 (37 N. W. Rep. 782). This is a brief but substantial statement of the case. The Supreme Court of the United States, holding that they must accept this construction of the statutes by the state court as conclusive, was of the opinion that, so construed, it was in conflict with the Constitution of the United States, in that it deprives—

"The company of its right to a judicial investigation by due process of law under the forms and with the machinery provided by the wisdom of successive ages for the investigation, judicially, of the truth of a matter in controversy, and substitutes therefor, as an absolute finality, the action of a railroad commission, which, in view of the powers conceded to it by the state court, cannot be regarded as clothed with judicial functions, or possessing the machinery of a court of justice."

The Court further says:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving, as it does, the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without

due process of law, and in violation of the Constitution of the United States; and in so far as it is ,thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

This is the whole substance of the decision. It will be noticed that the Court does not, except by implication from the language last above quoted, deny the right of the legislature itself to determine the reasonableness of the rates of which it may fix the maximum. *Munn v. Illinois* and the other cases are not expressly overruled in this regard. And the case still holds to the doctrine that the state may fix such maximum rates, and at best can only be claimed to decide that when the fixing of such rate is delegated to a commission, and the reasonableness of the rate fixed by such commission is attacked, the question of such reasonableness is one to be determined by the courts. And it is evident that the Court held also that it was competent for the legislature to create this commission, and that such commission had power to fix rates, provided such rates were equal and reasonable, as the opinion concludes as follows:

"In view of the opinion delivered by that court [supreme court of Minnesota], it may be impossible for any further proceedings to be taken other than to dismiss the proceedings for a *mandamus,* if the court should adhere to its opinion that, under the statute, *it cannot investigate judicially* the reasonableness of the rates fixed by the commission; still the question will be open for review."

An order was accordingly made, thus intimating clearly that if, upon judicial investigation, the rates fixed by the commission should be found equal and reasonable, the commission should be sustained in its finding and direction. Upon an examination of the facts and the opinion in this Minnesota case, and the cases heretofore cited,

beginning with *Munn v. Illinois,* it is clear to us that
the Supreme Court of the United States has not over-
ruled the case of *Munn v. Illinois* and the others follow-
ing it and cited in this opinion; and that the decision in
the Minnesota case rests, not on the right of the legisla-
ture to declare what is a reasonable maximum rate, but
upon its right to authorize a commission to do so. The
substance of this last decision is that whether or not the
rates established by such commission are reasonable is a
question for the courts, and not for the commission, to
determine, as such commission has no means or power to
carry on an investigation, and "cannot, in view of the
powers conceded to it by the state court, be regarded as
clothed with judicial functions, or possessing the machinery
of a court of justice." There is a vast difference between
the action and authority of a commission appointed by
the legislature and the action and authority of the legis-
lature itself,—the sovereign law-making power of the
state. There are many things that a legislature can do
that it cannot delegate to any other body; and, it would
seem, in the opinion of the Supreme Court of the United
States, that this is one of them.

And now to the case in hand. The Constitution of
this State, enacted, as before said, before the organization
of this defendant corporation, has given the Legislature
power to, from time to time, pass laws establishing reason-
able maximum rates of charges for railroad transporta-
tion. Who is to judge of the reasonableness of such leg-
islation, of the rates so fixed? Is it to be decided by the
courts not only upon each separate act of the Legislature,
but also in the case of every railroad company, and also
in the case of every person who brings suit for a viola-
tion of the law against such company? If so, the courts
will not fail of business, nor will the result of a deter-
mination of facts by juries, to which the court must apply

the law of reasonableness, be always harmonious or consistent. For instance, a railroad company, at the suit of one person, may establish that a certain rate is unreasonable, and, at the suit of another person, the same rate may be determined to be reasonable. The question will ever be open, and never closed. The result of such investigation may be different at one time than it might at another, as the facts generally and commonly understood to enter into the reasonableness of a given rate are liable to change each year, and perhaps each quarter of the year. The result will always be shifting and uncertain, and the determination in one suit will not bind in another, unless the parties are the same. We think the intention of the people in this constitutional enactment was to authorize the fixing of reasonable maximum rates exclusively by the Legislature. Then the result is certain and definite. The law is known, and there is no necessity for litigation, and there can be no different determination in like cases. If injustice shall be done by the Legislature, the remedy lies in the good sense of the people, and not in the courts. It would not be proper for this Court to presume that the people intended by the use of the word "reasonable" in this constitutional provision to authorize the courts to determine that which they have by such Constitution solemnly committed to the Legislature. It would be to presume that they intended to grant in fact the establishing of these rates to the courts, instead of to the Legislature, because, if it is for the courts to declare what is reasonable, the courts in effect fix the rates in the end.

In this view of the case, the circuit court was right in its judgment, and the same is affirmed, with costs.

CHAMPLIN, C. J., and LONG, J., concurred with MORSE, J.

CAHILL, J.  I concur with my Brother MORSE in the result reached in this case. The importance of the questions involved will justify me in stating some additional reasons that have occurred to me as supporting the position the. Court has taken, that the right to establish reasonable maximum rates of charges ·for the transportation of passengers and freight by railroads is, under our Constitution, vested in the Legislature, from whose judgment, as expressed in laws legally enacted, there is no appeal except to the people.  I should entertain this view independent of the constitutional amendment of 1870. Const. Art. 19*a*. Section 1, Art. 15, of the Constitution, authorizing the formation of corporations under general laws, provides that all such laws may be altered, amended, or repealed.  The defendant accepted a charter under a general law passed in pursuance of this constitutional power.  Under such law and charter it has availed itself of the extraordinary power of exercising the right of eminent· domain, and to occupy for its uses the public highways of the State.  The acceptance of a charter on such terms as were prescribed by the· Constitution and laws, and the acquisition of important property rights and franchises by virtue of powers therein granted, amounted to a consent on its part to legislative control.  In so far as its property is affected by it, it is by its own act of consent, and not by "due process of law."  There is, in my opinion, no need, under our Constitution, of basing the right of legislative control of railroads upon any presumed dedication of their property to public use, growing out of the interest which the public has in such property, and the manner of its use.  That presumption has been held sufficient to support such right by the Supreme Court of the United States in the Granger cases. *Munn v. Illinois*, 94 U. S. 113, 126.  In this State a railroad com-

pany needs to make no dedication of its property to public use, because it takes its property and franchises in the beginning charged with the incumbrance of legislative control. When it acquires life, it by the same act submits to limitations. This creature of the law consents to be born and to assume its functions knowing that its life and fortunes are intrusted to the discretion of its creator.

It is not contended by counsel for defendant that the State has no control over the rates of charges it shall make for the carriage of passengers. It is conceded that it can be required to charge only reasonable rates. But it is contended that the determination of what is reasonable is a judicial, and not a legislative, function. Under our Constitution it is the Legislature that has power to create corporations, and have them under control. No such power is vested in the judiciary in any sense different from that it has over natural persons. Nor is there anything in the power to be exercised that is essentially judicial. So far as the right has been exercised to regulate the charges of trucks and drays in cities, of wharfs, turnpikes, bridges, canals, grain elevators, ferries, and mills, the rates of interest for the use of money,—and it has been exercised in all countries so long that the memory of man runneth not to the contrary,—it has been done by legislation, and I know of no case where the matter has been referred to the courts. The legislature has peculiar advantages for arriving at a correct judgment as to what charges are reasonable, not possessed by the courts. A correct judgment can only be formed or approximated after a careful study of many facts concerning the cost of building and operating a road, the extent of its business and earnings. The Legislature can and has provided the machinery for collecting this information through the Commissioner of Railroads. Act No.

79, Laws of 1873. The courts have no means of accumulating this information. If anything were needed to demonstrate that the question of the reasonableness of rates of fares was legislative, rather than judicial, the record in this case would go far towards doing so. The plaintiff claims to have been injured to the extent of $1.60. To redress this grievance he brought this suit, and the defendant's position is that it has the right to show that the fare tendered was unreasonable in amount, reference being had to all the facts that must affect the question. If the contention of the defendant be admitted, and the question of reasonableness be tried and determined by the courts, nothing is settled by it except the question of the plaintiff's right to the small sum claimed as damages. No principle is or can be settled in this suit that will necessarily govern in other suits of a similar character, because the facts and circumstances that affect the cases may and usually must be somewhat different. In a court of law every case must stand upon its own facts, and neither party to a suit could be concluded by the judgment in a former suit to which they were neither parties nor privies. If, then, the reasonableness of a fare is a judicial question, to be settled only in a suit at law by the person aggrieved, the public is practically without remedy, as the costs and expenses of the litigation must inevitably exceed any possible recovery. It may be said with some force that this circumstance ought not to control or have much weight in determining a question of right; but, keeping in view the admitted fact that the power of control must rest somewhere, the practical facilities, on the one hand, and difficulties, on the other, are considerations that might properly weigh with those who were settling, in the formation of a Constitution, a method of governmental control.

Nor do I think that the constitutional amendment of

1870, before cited, which expressly provides that "the Legislature may, from time to time, pass laws establishing *reasonable* maximum rates of charges for the transportation of passengers and freight on different railroads in this State," is more than declaratory of a power that already existed. The argument that the use of the word *" reasonable"* in the amendment makes a judicial question out of what was without it a legislative question seems to me to be without force. The amendment of 1870 was neither a great nor a limitation of power. It was a declaration of power already reserved in the Constitution, and the amendment served only to put beyond question the right of the Legislature, which was before thought to be open to debate. It would be little short of usurpation, it seems to me, for the courts to assume to determine for the Legislature a question which the Constitution has solemnly committed to it. The use of the word " reasonable " may as well be regarded as an admonition to the Legislature as to the courts, and it cannot be assumed that the admonitions of the Constitution will be more sacredly regarded by one branch of the government than another. It seems to be considered by those who argue against legislative control that to concede the power to regulate carries with it the power to destroy. As a question of abstract power this may be true, but it is not truer of legislative than of judicial control. Concede the power, and its abuse is possible.

" All power is subject to abuse, and, if this circumstance is to be taken as an argument against its existence, we are irresistibly driven to results fatal to the existence of all government. * * * All human agencies are fallible, and the wisdom of man has never been able, and never will be able, to devise a system of government incapable of abuse. Every department may exceed its authority or pervert its power. The judiciary

83 MICH.—40.

has no pre-eminent claim to infallibility." GRAVES, J., in *People v. Salem*, 20 Mich. 503.

In my opinion the fear of spoliation by the Legislature is without foundation. That there is a desire on the part of the people to act fairly and to deal justly by the railroads is evidenced by the fact that, at considerable cost, they have established a bureau for the collection of the information absolutely necessary to the formation of a just judgment. That the Legislature may make mistakes is probable ; that it may act unjustly in a given case is possible ; but that it will in the end pursue a course calculated to cripple or destroy the railroads, those great arteries of trade, on which the commercial life of the people depends, is as unlikely as that a reasonable man will commit suicide.

As evidence that the right to fix the rate of charges for the transportation of passengers and freight by railroads belongs to the Legislature, and not to the courts, I call attention to the fact that the power has been exercised by the Legislature from the earliest history of the State. The Michigan Central charter, granted by special act in 1846, provided that the rate for passenger fares *should not exceed* three cents per mile, and for freight the charges were not to be greater than those upon certain New England roads named. Section 15, Act No. 42, Laws of 1846. The Michigan Southern charter limited the right of the company to such charges as were authorized by the State to be taken on January 1, 1846. Laws of 1846, Act No. 113, § 15. The first general railroad law, passed in 1855, contained an express limitation upon the charges that should be made by companies organized under it for the transportation of passengers and freight. Act No. 82, Laws of 1855, p. 160, § 17, subd. 9. See, also, revision of railroad laws (Act No. 195,

Laws of 1871, p. 336, § 10, subd. 9, 10; Act No. 198, Laws of 1873, p. 506, § 9, subd. 9; Act No. 177, Laws of 1877, p. 188, § 9, subd. 9). The rates of charges as fixed by these several acts, when we consider the cost of railroad construction and maintenance, the extent of the business transacted, and the earnings then, as compared with the present, were lower than the rates fixed by the act of 1889; and yet not only was the right of the Legislature to fix such rates not contested, but the reasonableness of the rates fixed was unquestioned.

No more important question than that involved here has in my judgment been before this Court. The issue is clearly made up, and we are to determine, perhaps for all time, the power of the State over the railroads built under the sanction of its laws. There are candid and thoughtful men, men who love justice and hate oppression, who fear for the result if this great public interest is given over to legislative control, freed from any judicial supervision. I do not join in those fears, but, if I did, I could not change my views of the power which the Constitution has vested in the Legislature over this subject. A legislator who, in the exercise of this great power committed to him by the Constitution, suffers himself to be influenced by any motive except a desire to deal justly between the people and those who, by putting their fortunes into the railroads, have enriched and made prosperous our Commonwealth, is an enemy of the State, and unworthy of citizenship in it.

GRANT, J. I concur in the result under the rule of *stare decisis*, regarding the question as settled by the decisions of the Supreme Court of the United States referred to in the opinion of my Brother MORSE.